**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas Edward MADRID,
Defendant–Appellant.**

No. 93–8113.

United States Court of Appeals,
Tenth Circuit.

July 7, 1994.

Michael R. O'Donnell, Asst. Federal Defender, Cheyenne, WY, for appellant.

Lee Pico (David D. Freudenthal, U.S. Atty., Aleksander D. Radich, Asst. U.S. Atty., William U. Hill, Asst. U.S. Atty., D. Wyoming, Cheyenne, WY, with him on the brief), for appellee.

Before EBEL, KELLY and BARRETT, Circuit Judges.

BARRETT, Senior Circuit Judge.

Thomas Edward Madrid (Madrid) appeals from the judgment and sentence entered following his conditional plea of guilty to the indictment charging him with unlawful possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Madrid was sentenced to a term of 51 months incarceration.

On appeal, Madrid presents the issue as: "Did the District Court err in finding the Defendant voluntarily consented to accompany a police officer from the scene of his automobile accident into a nearby town when that police officer was intentionally hiding from the Defendant his investigative purpose in transporting him into that nearby town?" (Brief of Appellant, p. 2).

*Facts*

A detailed summary of the evidence adduced at the suppression hearing follows.

At approximately 7:00 a.m. on March 22, 1993, Madrid, of Yuma, Arizona, was driving a van bearing California license plates with permission of its owner, Robert Brown. The weather on Interstate 80 near the 8,000 foot "summit" east of Laramie, Wyoming was cold, windy, and icy. The van spun out, left the highway, hit an embankment, flipped over, and came to a stop. Madrid suffered only a few scratches. A passer-by stopped and, at Madrid's request, used his cellular phone to call "the cops." (R., Vol. II, p. 16). Soon thereafter, a trucker stopped at the scene and Madrid drank a cup of coffee in the cab of his truck while awaiting the appearance of police.

Wyoming Highway Patrolman Dan Dyer, a 16–year veteran, responded to Madrid's accident report and arrived at the scene of the accident about 7:29 a.m. He observed the van backed into the side of a snowbank on the eastbound side of I–80. The back end of the van was badly damaged.

*Testimony of Thomas Edward Madrid*

When Officer Dyer came upon the scene of the accident, Madrid left the cab of the truck. Dyer commented that it was a bad accident and that Madrid was lucky to be alive. Dyer then asked Madrid where he was coming from. Madrid responded, "California." (R., Vol. 2, p. 17). When asked what had happened, Madrid explained that his van started to spin out on the ice and before he could react, "I hit the embankment, flipped over in the air, and came to a stop." *Id.*

Officer Dyer asked Madrid for his driver's license. Madrid explained that it was in his wallet which he had left at the Pilot Gas Station in Laramie. However, Madrid informed Dyer that he had a valid Arizona driver's license, which Dyer then confirmed through a dispatcher. Madrid also produced the vehicle registration papers at Dyer's request. Madrid stated that the van was owned by Robert Brown of California who loaned him the car. Brown was an acquaintance with nightclub owner contacts in the Los Angeles area and he had helped to get engagements for their band. *Id.* at 25, 26, 45. Madrid heard Officer Dyer advise the dispatcher to phone the Pilot Gas Station to determine if anybody had turned in a wallet containing Madrid's driver's license and social security card.

Because of the coldness, Madrid and Dyer entered Dyer's patrol car. Dyer started to complete the accident report while awaiting the tow truck. Dyer asked Madrid questions concerning the accident, such as Madrid's speed, conditions of the road, insurance, etc. Madrid informed Dyer that he was traveling to North Carolina to visit his mother and an uncle, and perhaps to bring them back to California.

When Dyer asked Madrid about his work, Madrid stated that he worked for his cousin booking engagements for a band which played in Mexico, crossing the border at Tijuana.

Dyer and Madrid then left the patrol car to get whatever Madrid wished to remove from the van. Apparently, Madrid removed the vehicle registration and insurance papers. Later, Dyer asked Madrid to hold the dummy end of a tape as Dyer took various measurements in order to complete the accident report. The two returned to Dyer's patrol car after completing the measurements.

Madrid recalled that after Dyer ordered a tow truck, another patrol officer phoned and asked Dyer, "Do you want to talk to me?" Dyer responded, "Yeah, I'll talk to you when we get there." He also recalled the other patrol officer asking Dyer, "What do you got?" To which Dyer responded, "I'll tell you when we get there." *Id.* at 24–25.

Shortly thereafter, another highway patrol officer, Sergeant Johnson, arrived at the scene of the accident. Madrid observed the patrol officer and Dyer inspecting the van and the scene of the accident. The tow truck arrived at the scene about 9:00 a.m. It took about 20 minutes for the tow truck driver to move the van away from the hillside and to get it hooked up. At Officer Dyer's request, Madrid helped Dyer take additional measurements during the time it took to hook up the van to the tow car. It was very cold. During the taping, Officer Dyer said to Madrid, "Well, I'll take you on in there (to Laramie), take you to the tow yard, take you to the Western Union or Greyhound bus depot. I just want you to know where the van is so you can take care of it." *Id.* at 32.

Officer Dyer, accompanied by Madrid, followed the tow truck into Laramie. The highway patrol car operated by Sergeant Johnson preceded them. The trip into Laramie took about 20 minutes. Officer Dyer did not provide Madrid with an opportunity to travel with the tow truck and the van. Dyer did not ask Madrid any questions concerning drugs, although he did ask Madrid whether he had any weapons on him or in the van. *Id.* at 33–34. Madrid recalls that Officer Dyer made only one radio call during the trip and that was to advise that they were then going to the tow yard.

When they arrived at the tow yard, Madrid observed Sergeant Johnson's patrol vehicle and another police car parked there. Madrid also observed a dog in one of the police cars. He saw Officer Dyer, Sergeant Johnson, and another officer confer. He then saw the officers walk around the van. He observed Officer Dyer with a tire iron in his hand and saw Dyer pry open the two rear doors of the van. The three officers then approached Madrid. Officer Dyer asked Madrid if he had any narcotics in the van. Madrid answered, "No, there isn't." *Id.* at 37. A sheriff's officer then remarked that if there were narcotics in the van, they would find them. *Id.* During this time, Officer Dyer said, "Well, you're not under arrest, but it wouldn't be too prudent for you to just walk away." *Id.* at 38. Madrid believed that this statement meant that he could not walk away. *Id.* About this time, Officer Dyer asked Madrid to remove his sweatshirt and he proceeded to frisk Madrid for weapons. *Id.* at 40.

Madrid then observed a sheriff's officer take the dog around the van a couple of times. Afterwards, the three officers approached him and asked, "Where's the narcotics in this car?" Madrid responded, "I don't know what you're talking about." *Id.* The officers informed him that was not what the dog said. *Id.* The officers took the dog around the van again and then into the van. Madrid asked Sergeant Johnson what they were looking for. The officers approached Madrid again and informed him that it was just a matter of time before they found it and that he might as well tell them where the

narcotics were located in the van. Madrid denied knowing what they were talking about, and remarked that he was going to the bathroom. *Id.* at 41. The door to the bathroom was locked, so Madrid went to the tow yard office to obtain a key. When he left the office, Officer Dyer approached him again and stated that he was going to frisk him again. Madrid remarked that he had already frisked him once. Dyer responded, "Bear with me." *Id.* at 42. Officer Dyer then reached into Madrid's pocket and pulled out a spoon, a knife, and a syringe. *Id.* Madrid acknowledged that he kept the spoon and the syringe handy because he was still using drugs. *Id.* at 43. At this point, Officer Dyer placed Madrid under arrest.

On cross-examination, Madrid stated that, following the accident, he stayed at the scene after the police were contacted by a passer-by because in California it is against the law to leave the scene of an accident. *Id.* at 46. Madrid denied telling law officers that the Robert Brown who owned the van and who loaned it to him for the trip to North Carolina was his cousin, his boss, or his brother-in-law. *Id.* at 48. Madrid stated that Brown was simply an acquaintance. *Id.* During the period Madrid and Officer Dyer were in Dyer's patrol car, Dyer, in response to Madrid's question, informed him of all available transportation out of Laramie, *id.* at 52, and Dyer also informed him that he would take him wherever he needed to find out about transportation. *Id.* at 53. After Sergeant Johnson arrived at the scene, Madrid freely moved about the area, in and out of the patrol car. *Id.* Madrid stated that Officer Dyer had informed him that he would take him wherever he needed to go, including the tow yard. *Id.* at 54. Madrid did not request to ride into Laramie in the tow truck. *Id.* At no time did Officers Dyer or Johnson ever mention narcotics or drugs to Madrid. *Id.* at 55.

At the tow yard, Officer Dyer inquired of Madrid whether there were any narcotics in the van. *Id.* at 56. After the dog completed its search of the van, Officer Dyer conducted another search of Madrid, resulting in discovery of the spoon, knife, and syringe. Madrid's arrest followed. *Id.* at 57.

On re-direct examination, Madrid testified that he did not feel free to leave at any time he was at the tow yard. *Id.* at 59. He did believe he was free to leave while out on the highway, but not at the tow yard. *Id.* He did not feel free at any time to terminate the "encounter" with the law enforcement officers. *Id.* at 60.

### Testimony of Dan Dyer

Dan Dyer had been a state highway patrolman for 16 years when he was contacted on the morning of March 22, 1993, to investigate an accident east of Laramie on Interstate 80. *Id.* at 62. Dyer arrived at the scene of the Madrid accident about 7:29 a.m. He examined the damaged van and inquired of Madrid what had happened.

In the patrol vehicle, Officer Dyer asked Madrid questions concerning the accident necessary for his report. It was very cold outside. Dyer stated that Madrid informed him that the van belonged to his boss and that he was going to North Carolina to pick up some relatives and take them back to California. *Id.* at 63. He confirmed Madrid's testimony concerning the driver's license and the wallet. However, Officer Dyer stated that he was never able to find any insurance papers or evidence of insurance covering the van. *Id.* at 65. Dyer and Madrid discussed checking up on Madrid's lost billfold, transportation out of Laramie, and Western Union. Dyer informed Madrid that he would take him wherever he wanted to go. *Id.* at 66. Officer Dyer was told by Madrid that Robert Brown had hired him to find bands or places to play in Mexico. *Id.* at 67. After calling for a wrecker, Dyer and Madrid took some measurements of the accident scene. *Id.* at 68. The van was empty except for two small gym bags, one about two feet long and ten inches high and the other about three-fourths that size. *Id.* There was no bedroll or sleeping bag in the van, although Madrid had stated that he had slept in the van on the trip. *Id.* at 69.

When Sergeant Johnson arrived at the scene, Officer Dyer told him that he suspected the van contained a "load of narcotics" because narcotics are transported out of California. Also, the registered owner of the van

lived in the Los Angeles area, and in 80 to 90 percent of the cases he had investigated, the owner was not present with the vehicle. *Id.* at 70. Moreover, traveling very light, with only $65, and without a driver's license to a drug destination area were factors consistent with drug "courier-type affairs." *Id.* at 70–1.

Officer Dyer did not believe that Madrid was under the influence of narcotics. *Id.* at 72.

The wrecker arrived shortly after Sergeant Johnson came upon the scene. The wrecker operator had difficulty hooking onto the van and it took 20 to 30 minutes to do so. *Id.* at 74. Finally, when the van was hooked, Sergeant Johnson left for Laramie in the lead patrol car, followed by Officer Dyer's patrol car with Madrid as his passenger and the wrecker vehicle, with the van in tow. *Id.* at 75. Enroute, Officer Dyer called the sheriff's dispatch and asked to have 523 meet him in Laramie at the I–80 turnoff and said "I am Code 9." *Id.* That meant that Dyer could not talk much and did not want the dispatcher to ask him any questions and to please do as asked. *Id.* at 76. At no time had Officer Dyer informed Madrid that he must ride in Dyer's patrol car. *Id.* at 77. Had Madrid wished to walk from the scene back to Laramie, Officer Dyer would have had to let him go. Even though Dyer felt sure the van contained narcotics, Madrid was not in his custody. *Id.* at 78.

At the towing yard, Dyer informed Detective Debree of the Albany County Sheriff's Department that he suspected that there were narcotics in the van. *Id.* at 79. Shortly thereafter, Axel, the narcotics-sniffing dog, arrived on the scene and alerted to the undercarriage of the van. *Id.* at 80. About that same time, but before Dyer was aware of the actual dog alert, he said to Madrid, "Ed, you know, you're not under arrest. You're free to go. It might look a little funny if you walked off now." *Id.* at 80–81.

The officers then examined the undercarriage of the van where the dog had alerted and discovered two tanks on the van, one towards the center, and the other near the back, with new bolts and nuts on the back tank indicating that the tank had been recently installed. *Id.* at 82. Shortly thereaf-

ter, Madrid was seen by Dyer walking toward the bathroom. Detective Debree said, "Pat him down." *Id.* Officer Dyer then patted Madrid down because of Debree's request and because Madrid had a dejected, slow manner. *Id.* at 85. At the time, Officer Dyer recalled thinking about a December, 1992, incident when he had put a person in jail for auto theft who then hanged himself. Officer Dyer didn't want a similar incident here. *Id.* During the pat-down, Dyer pulled out a syringe, a spoon, and a pocket knife from Madrid's flannel jacket. *Id.* at 85–86. He then placed Madrid under arrest, handcuffed him, and read him his Miranda rights. *Id.*

Madrid was then taken to the Albany County jail, and the officers proceeded to obtain a search warrant. *Id.* With the search warrant in hand, the officers discovered six packages of marijuana in the back gas tank, each weighing about ten pounds. *Id.* at 88. Officer Dyer also found a wrench set in the van which fit the nuts and bolts of the tank. *Id.* at 89.

On cross-examination, Officer Dyer acknowledged that he had noted in his written investigative report that Madrid appeared to look like an itinerant farm worker. *Id.* at 90. Initially, when he saw the vehicle at the accident scene, he thought that farm workers must have been involved in the accident. *Id.* Dyer was surprised to hear Madrid speak fluent English. *Id.* at 91.

Dyer acknowledged that he began suspecting Madrid of carrying drugs in the van very early in the investigation. *Id.* at 93. However, he did not ask Madrid any questions concerning drugs, or whether Madrid would consent to a search of the van. *Id.* at 101. When Officer Dyer radioed for Number 523, Code 9, he was requesting that Detective Debree and his canine unit meet them at the tow yard. *Id.* at 103. Dyer stated that Madrid had been very helpful and cooperative during the investigation, and that he believed that Madrid wished to ride with him to the tow yard, the bus depot, and the Western Union office in Laramie. *Id.* at 104. Dyer did not inform Madrid that he (Madrid)

had the right to go with the tow truck driver and the van back to Laramie. *Id.*

Officer Dyer was aware that Detective Debree asked Madrid questions concerning narcotics and drugs at the tow yard. *Id.* at 111. These questions were asked after the drug dog had alerted. *Id.* at 112. There were three pat-downs of Madrid prior to his arrest, one at the scene of the accident and two at the tow yard. *Id.* at 112–13. One of the tow-yard pat-downs consisted of a request that Madrid pull up his shirt. *Id.*

On redirect reexamination, Officer Dyer stated that his suspicions of drug activity developed as he conversed with Madrid and investigated at the scene of the accident. *Id.* at 114. In his experience as a highway patrol officer, Dyer had transported into Laramie as many as 20 persons involved in accidents on the summit during the course of investigating 70 to 80 such accidents. *Id.* at 114–15.

### Testimony of Robert James Debree

Robert James Debree had served as detective and canine handler for the Albany County Sheriff's Department since January, 1985. *Id.* at 119. On March 22, 1993, after the canine had alerted and after Madrid had been arrested at the tow yard, he and Officer Dyer prepared an affidavit for a search warrant of the van. *Id.* After the search warrant was obtained, the van was moved to a county shop, placed on a lift, and the false gas tank was removed. *Id.* at 120.

Before the dog alerted, Debree observed that Madrid was acting "extremely strange." *Id.* at 121. Debree inquired of Madrid where the drugs were located in the van, and Madrid replied that he did not know. *Id.* Thereafter, Madrid asked for and received permission from Officer Dyer to go to the bathroom. *Id.* at 122. Because Madrid was continually looking at Debree and acting extremely nervous, Debree asked Dyer whether he had searched Madrid. Dyer responded that he had patted Madrid down lightly. *Id.* Debree suggested that because of the way Madrid was acting, he should be searched extensively. *Id.* Debree then informed Madrid that the dog had alerted on the vehicle. Officer Dyer conducted the search of Madrid

resulting in discovery of the syringe. *Id.* at 123.

On cross-examination, Debree stated that he believed that Madrid should be searched extensively for weapons because of Madrid's actions in "continually looking, trying to find my location." *Id.* at 125–26. Debree stated that the dog had already alerted to the vehicle before Madrid was searched. *Id.* at 127. He repeated that the search was conducted for officer safety purposes. *Id.* at 128.

On re-direct examination, Debree stated that the dog alert was an objective indication that narcotics were contained in the vehicle. *Id.* at 129. He repeated that it was only after the dog alerted that he spoke with Madrid concerning narcotics in the vehicle and suggested that Officer Dyer search Madrid extensively. *Id.*

### District Court's Proceeding

Counsel for Madrid argued that Madrid was improperly detained by the law enforcement officers in that Madrid had no reasonable choice other than to accompany Officer Dyer. Counsel for the government argued that this was simply a citizen-police consensual encounter and that the Fourth Amendment was not implicated.

The district court denied Madrid's Motion to Suppress, finding/concluding that under *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the court must consider all of the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's request or to terminate the encounter. Based thereon, the court found that until Madrid was patted down and arrested at the tow yard, the encounter was entirely consensual and there was no investigative detention. (R., Vol. II, p. 137). Furthermore, the district court found that Officer Dyer had probable cause to be suspicious of the vehicle and of Madrid, justifying his request for the drug-sniffing dog. *Id.*

### Discussion–Conclusion

In reviewing a district court's denial of a motion to suppress, we must accept the court's findings of fact unless they are clearly erroneous. *United States v. Swepston*, 987 F.2d 1510, 1513 (10th Cir.1993); *United States v. Anderson*, 981 F.2d 1560, 1566 (10th Cir.1992). In so doing, we must view the evidence in the light most favorable to the government. *Id.* "At a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence together with the inferences, deductions and conclusions to be drawn from the evidence, are to be determined by the trial judge." *United States v. Pappas*, 735 F.2d 1232, 1233 (10th Cir.1984), quoting *United States v. Donahue*, 442 F.2d 1315, 1316 (10th Cir.1971). However, we review *de novo* the "ultimate determination of Fourth Amendment reasonableness." *United States v. Allen*, 986 F.2d 1354, 1356 (10th Cir.1993). The proponent of a motion to suppress bears the burden of proof. *United States v. Carr*, 939 F.2d 1442, 1446 (10th Cir.1991).

In *United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir.1993), we identified three categories of police-citizen encounters. The first involves the voluntary cooperation of a citizen in response to non-coercive questioning. The second is a *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), stop, involving only a brief, non-intrusive detention and frisk for weapons when officers have a reasonable suspicion that the defendant has committed a crime or is about to do so. The third encounter is the arrest of the defendant.

Madrid contends that he did not voluntarily consent to accompany Officer Dyer from the scene of the accident into Laramie and that he was seized and investigatively detained because Dyer's investigative purpose behind transporting him into Laramie was intentionally concealed from him. Madrid argues that because Officer Dyer did not have a reasonable, articulable suspicion and because he never questioned Madrid relative to his suspicions that Madrid was transporting drugs, this court should, on policy grounds alone, refuse to condone the deceitful and duplicitous actions of the law enforcement officers designed to subvert the protections afforded by the Fourth and Fifth Amendments to the Constitution.

Madrid relies heavily on our opinion in *United States v. Recalde*, 761 F.2d 1448 (10th Cir.1985). In that case, Recalde had been stopped by New Mexico state patrol officers for speeding. During the course of the stop, the officers developed a belief that, based on some screws in the Recalde vehicle which had been tampered with, Recalde was transporting narcotics. The officers retained Recalde's driver's license and vehicle registration, and requested that Recalde follow them into a nearby town where he was given his *Miranda* rights and consented to a search of his vehicle. We held that because the officers lacked probable cause to arrest Recalde for a stolen vehicle or possession of narcotics, their actions in detaining and transporting him into the nearby town without his consent in the hope of developing sufficient probable cause or obtaining Recalde's consent to search in a more custodial setting violated the Fourth Amendment. 761 F.2d at 1456.

We reject Madrid's arguments. First, the record is clear that Officer Dyer's suspicions that narcotics were being transported by Madrid in the van—articulable or otherwise— were never communicated to Madrid in words, actions, or deeds. These beliefs were simply well-founded suspicions of an experienced, conscientious law enforcement officer. It is well settled that an experienced, trained law officer such as Officer Dyer is "entitled to assess the facts in light of his experience," *United States v. Brignoni–Ponce*, 422 U.S. 873, 885, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975), based on the "totality of the circumstances." *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). Second, nothing in the record demonstrates that Officer Dyer did anything in the presence of Madrid which did not accommodate and serve Madrid's needs. It was Madrid who was stranded at the 8,000 foot summit without proper clothing on that cold, blustery day. It was Madrid who sought police help and who voiced no objection when Officer Dyer transported him to the tow yard in Laramie. While there and before the drug dog arrived on the scene, the law en-

forcement officers did not restrain Madrid in any way. Had he wished to depart for the Western Union office or the bus depot, he had only to do so. Even after the drug dog arrived at the tow yard, Officer Dyer advised Madrid that he was free to leave, that he was not under arrest, but that it might look a little funny if he left.

In *United States v. Little,* 18 F.3d 1499, 1503 (10th Cir.1994), we held (en banc) that in considering a motion to suppress evidence, the somewhat "necessarily imprecise," *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988), test set forth in *Bostick,* 501 U.S. at 439–41, 111 S.Ct. at 2389, must be applied in determining whether a seizure of the person has occurred implicating the Fourth Amendment or whether the encounter is consensual:

> [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

*Little* held that each case involving a motion to suppress evidence must turn on the totality of the circumstances and, as stated in *Michigan,* 486 U.S. at 573, 108 S.Ct. at 1979, the focus must be on the coercive effect of police conduct, taken as a whole, "on a reasonable person."

This record is devoid of any words or actions by Officer Dyer which were coercive. Nevertheless, Madrid argues that "because Officer Dyer never revealed his hidden agenda," (Appellant's Reply Brief, p. 4), the overall encounter was deceptive and coercive. Madrid argues that Officer Dyer never intended to take him to the airport or the bus depot and therefore Dyer lied about these matters. *Id.* However, our evaluation of the circumstances involves an objective, not subjective standard.

The encounter was entirely consensual, and remained so until Madrid was searched and arrested. The trial court found, and we agree, that Officer Dyer's actions at the scene of the accident and in transporting

Madrid into Laramie behind the tow truck so that Madrid would know where the van was being stored were acts of courtesy and hospitality. (R., Vol. II, pp. 136–37). The court further found that there was no "police intrusion upon the defendant's liberty until the dog alerted to the presence of drugs—and drug paraphernalia was then found upon the defendant's person." *Id.* We must accept these findings of fact unless they are clearly erroneous. *United States v. Soto,* 988 F.2d 1548, 1557 (10th Cir.1993). Here, they are not clearly erroneous. The court correctly observed that "it was just the misfortune of the defendant to have an investigating officer who was terribly well experienced." (R., Vol. II, p. 138).

In *United States v. Zapata,* 997 F.2d 751, 757 (10th Cir.1993), *United States v. Laboy,* 979 F.2d 795, 799 (10th Cir.1992), and *United States v. Bloom,* 975 F.2d 1447, 1455 n. 9 (10th Cir.1992), we held that the subjective state of mind of the defendant is irrelevant to the objective "reasonable person" test set forth in *Bostick* except to the extent that they may have been known to the officer and influenced his conduct. The test is whether the defendant has an objective reason to believe that he is not free to end his encounter with a police officer and proceed on his own way for Fourth Amendment purposes. *United States v. Turner,* 928 F.2d 956, 958–59 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991). The evolution of the "reasonable person" test is based on "common sense and ordinary human experience." *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). The subjective state of mind of a police officer is also irrelevant, except that his words and actions must be closely examined in relation to his suspicious in order to evaluate whether they had a coercive, intimidating effect upon the defendant. Such is not true in this case.

In *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973), the Supreme Court observed that police officers are expected to perform "community caretaking functions, totally divorced from the detection, investigation, or acquisition of

evidence relative to the violation of a criminal statute." Here, Officer Dyer was clearly performing community caretaking functions in driving Madrid into Laramie from the scene of the accident. The trial court observed that this was an act of courtesy by what is known as "the Wyoming Courtesy Patrol" and that Madrid "took advantage of the invitation to follow the tow truck into Laramie so that he would know where the van was being stored." (R., Vol. II, p. 137). We agree. We reject Madrid's argument that Officer Dyer took him to the tow yard simply to continue his drug investigation, not simply to show him where the van was. (Brief of Appellant, p. 17). Clearly, Madrid should have been concerned about the storage of the vehicle, its location, and towing/rental charges, and any arrangements relative to its repair. In any event, the record simply does not support any claim that Madrid was coerced or detained.

In *INS v. Delgado*, 466 U.S. 210, 221, 104 S.Ct. 1758, 1765, 80 L.Ed.2d 247 (1984), the Supreme Court held that the practices of INS officers in entering and systematically questioning workers relative to their immigration status while armed and displaying their badges and without indicating that the workers were free to leave were "classic consensual encounters rather than Fourth Amendment seizures." *See also, Michigan*, 486 U.S. at 574–76, 108 S.Ct. at 1979–81 (officers did not seize the defendant whom they observed running down the street when they accelerated to catch up with him and drove alongside him for a short distance in a marked police car).

Moreover, this case is distinguishable from *United States v. Gonzalez*, 763 F.2d 1127 (10th Cir.1985). There, we held that police officers, while holding the defendant's driver's license, automobile registration, and car title, did not provide the defendant with any choice when they politely asked him to accompany them. *See also Recalde*, 761 F.2d at 1452.

The government has the burden of proving a voluntary consent. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Price*, 925 F.2d 1268, 1271 (10th Cir.1991). Here, the government carried its burden of proof. Madrid freely and voluntarily accepted Officer Dyer's invitation to ride in the patrol car to the tow yard in Laramie.

■ Madrid further contends that he was seized and investigatively detained because Officer Dyer intentionally concealed from him the investigative purpose behind transporting him into Laramie. We disagree that this case involves a *Terry* investigatory detention, simply because Madrid was never detained by Officer Dyer or other law officers until his arrest.

*Terry* was the first case to recognize that "the Fourth Amendment governs 'seizures' of the person ... [other than] arrests" and held that, lacking probable cause to arrest, a police officer may "when observing unusual conduct which leads him to reasonably conclude in light of his experience that criminal activity may be afoot and that persons may be armed and presently dangerous," "conduct a carefully limited search of such persons in an attempt to discover weapons which might be used to assault him." 392 U.S. at 15, 88 S.Ct. at 1876. *See also Adams v. Williams*, 407 U.S. 143, 147–48, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612 (1972).

■ In order to ascertain whether a person is in custody, the court must examine all relevant facts to determine how a reasonable person in the defendant's position should have understood the situation. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151–52, 82 L.Ed.2d 317 (1984); *Griffin*, 7 F.3d at 1518. The question is always whether, from an objective viewpoint, someone in the defendant's position would reasonably believe that he was being held in custody. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983); *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150. We hold that, based on the totality of the circumstances, the encounter between Madrid and the law officers did not constitute a seizure until Madrid was frisked and arrested at the tow yard.

From *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) and *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir.1993), we recognize that a dog

alert is reliable enough to create the "fair probability that contraband or evidence of a crime will be found in a particular place."

We affirm the district court's Order denying Madrid's Motion to Suppress and the judgment of conviction and sentence.

**AFFIRMED.**