PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**F I L E D**
United States Court of Appeals
Tenth Circuit

**JUL 18 2003**

**PATRICK FISHER**
**Clerk**

PHILLIP R. HATHEWAY,

     Plaintiff-Appellee,

v.

JOHN P. THIES and SHANNON
McGUIRE,

     Defendants-Appellants.

No. 02-2168

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW MEXICO
(D.C. No. CIV-00-1200 MCA/RLP)**

---

Kathryn Levy, Deputy City Attorney, City of Albuquerque (Robert M. White, City Attorney, with her on the brief), for the Defendants-Appellants.

Paul J. Kennedy (Mary Y. C. Han on the brief), Albuquerque, New Mexico, for the Plaintiff-Appellee.

---

Before **HENRY** and **McKAY**, Circuit Judges, and **BRORBY**, Senior Circuit Judge.

**PER CURIAM** .

Detectives John P. Thies and Shannon McGuire appeal the district court's order denying them qualified immunity from the plaintiff Phillip R. Hatheway's 42 U.S.C. § 1983 Fourth Amendment claim. Mr. Hatheway's claim arises out of his Dec. 11, 1999 detention and interrogation by Detectives Thies and McGuire, who worked for the City of Albuquerque and suspected Mr. Hatheway of committing a robbery.

Detectives Thies and McGuire contend that a reasonable official would have concluded that Mr. Hatheway consented to the detention and interrogation. We disagree and therefore affirm the district court's denial of qualified immunity.

## I. FACTUAL BACKGROUND

Between 3:00 p.m. and 3:30 p.m on the afternoon of December 11, 1999, Albuquerque police received reports of a robbery at a Subway Restaurant on Montano Boulevard. An Albuquerque police officer proceeded to the restaurant and obtained statements from witnesses.

The witnesses gave conflicting descriptions of the robber. However, one of them saw the robber get into a dented, red 1980s model Mazda RX-7 with tinted windows and wrote down the car's license plate number.

The Albuquerque Police Department assigned Detectives Thies and McGuire to the case. They reviewed the witnesses' statements and watched a

videotape of the robbery, which did not provide a clear image of the offender.

Detectives Thies and McGuire then discovered that the license plate obtained by the witness matched a red RX-7 registered to Mr. Hatheway. From the Department of Motor Vehicles, they obtained three possible addresses for him. At one of the addresses, they interviewed Mr. Hatheway's daughter and son-in-law. The daughter told them that Mr. Hatheway did own two red Mazda RX-7's, that he "hangs around with a bunch of knuckleheads," and that "it wouldn't surprise [her]" if they had borrowed a car to commit the robbery. Aplts' App. at 52-53.

Between 8:40 and 9:00 p.m., the two detectives proceeded to another one of the addresses listed for Mr. Hatheway, a trailer park on N.W. 2nd Street. At the detectives' request, other officers came to the scene, blocked Mr. Hatheway's driveway, and surrounded the trailer. Detective McGuire and Officer Thomas Garduno approached the door with guns drawn. Officer Garduno then knocked on the door.

Mr. Hatheway testified that he was inside his trailer ironing his curtains and listening to Christmas music when he heard someone pounding on his door in a manner that scared and startled him. Mr. Hatheway opened the door, and officers grabbed him by the wrists and pulled him down to the ground.

According to Officer Garduno and Detective McGuire, Mr. Hatheway

opened the door rapidly and stepped completely out of the trailer in a quick movement, appearing agitated. With guns drawn on him, one or both of the officers identified themselves as members of the Albuquerque Police Department and told Mr. Hatheway to place his hands on his head and step backwards toward them. Mr. Hatheway complied, and Detective McGuire placed him in handcuffs. Detective McGuire also patted down Mr. Hatheway but found no weapons.

Detective McGuire spoke to Mr. Hatheway briefly, while other officers performed a protective sweep of the trailer. According to Detective McGuire, he explained to Mr. Hatheway that the officers were conducting an investigation but added that "I don't want to say anything about this investigation right now. We'll talk shortly thereafter." Id. at 135.

After the other officers completed the protective sweep, the detectives and Officer Garduno conferred. They decided to impound Mr. Hatheway's car and transport him to the police station. Detective McGuire informed Mr. Hatheway that "we need to talk about what's going on here, but I don't want to do that here. Let's go up to the substation." Id. at 136. According to Detective McGuire, Mr. Hatheway "seemed to fully agree. In essence, [Mr. Hatheway's] words were something to the effect of, 'That's fine with me,' just you know, 'I'll cooperate.'" Id.

Mr. Hatheway gave a somewhat different account of the conversation with

the police officers outside his trailer. According to Mr. Hatheway, the officers told him that they were from the Albuquerque Police Department, that he was under arrest, and that they were going to take him to the police station. See id. at 212. He asked the officers several questions about their investigation, and they told him to "[s]hut up." Id.

Between about 9:15 to 9:30 p.m., the detectives placed the handcuffed Mr. Hatheway in a police car and drove him to the Albuquerque Police Department's North Valley Substation for questioning. Detective Thies interrogated Mr. Hatheway, while Detective McGuire listened and taped the interrogation. Detective Thies removed the handcuffs, and, after about ten minutes of questioning, informed Mr. Hatheway of his Miranda rights. At Detective Thies's request, Mr. Hatheway signed a written waiver form, which stated that "I am willing to make a statement and answer questions," "I do not want a lawyer at this time," " I understand and know what I am doing," "[n]o promises or threats have been made to me," and "no pressure or coercion of any kind has been used against me." Id. at 243.

Mr. Hatheway proceeded to answer Detective Thies's questions. In his deposition, Detective Thies was asked whether "it was clear that Mr. Hatheway was not free to leave th[e] [interrogation] room," and Detective Thies responded, "For sure[,] after I read him his rights." Id. at 124.

The transcript of the interrogation indicates that Mr. Hatheway asked Detective Thies if he could go home at least four times. Detective Thies did not respond to the first request. See id. at 83. On the second occasion, Mr. Hatheway said "You're not letting me go home," and Detective Thies responded, "I guess your being held for questioning. I read you your rights." Id. at 84 (emphasis added). On the third occasion, Mr. Hatheway asked, "[H]ow many hours, now? How long is this going to keep up?" and added, "I'd like to go home." Id. at 85. Detective Thies responded, "It's going to keep up as long as it takes." Id. (emphasis added). On the fourth occasion, Mr. Hatheway asked, "Can I go home now, sir?" Detective Thies responded, "Not yet. I'm not done talking to you." Id. at 86 (emphasis added).

Detective Thies also used some aggressive language during the interrogation. For example, he told Mr. Hatheway to "[s]hut up" and added, "Anything you have to say to me, until it's the truth, is shit. You understand me?" Id. at 87-88.

After about five hours, Detective Thies ended the questioning and allowed Mr. Hatheway to walk home. Mr. Hatheway was never charged with a crime arising out of the robbery of the Subway restaurant.

Mr. Hatheway subsequently filed this § 1983 action alleging that Detectives Thies and McGuire and several other Albuquerque police officers

-6-

violated his Fourth Amendment rights by detaining him without reasonable suspicion and then arresting him without probable cause.[1]  He also named the City of Albuquerque as a defendant and asserted state law claims for false arrest, false imprisonment, assault and battery, and trespass.

After the completion of discovery, the district court granted partial summary judgment to Detectives Thies and McGuire and Officer Garduno.  The court also granted partial summary judgment to Mr. Hatheway.

As to the initial detention of Mr. Hatheway, the court concluded that the detectives and the officers had reasonable suspicion and therefore did not violate the Fourth Amendment.  The court further concluded that the defendant officers did not act unreasonably as to the degree of force that they used to initially detain Mr. Hatheway.[2]

As to the detectives' transporting Mr. Hatheway to the substation and interrogating him there, the district court concluded that (1) the officers lacked probable cause to make an arrest and (2) Mr. Hatheway did not consent to remain at the police station to answer questions.  The court therefore granted partial

---

[1]  The conduct of these other officers and the policies of the City of Albuquerque are not at issue in this appeal.

[2]  Mr. Hatheway has not sought to cross appeal the grant of partial summary judgment as to the initial detention.  Indeed, we would lack jurisdiction over such an interlocutory appeal, which would not involve the denial of qualified immunity.

summary judgment to Mr. Hatheway and against Detectives Thies and McGuire on that particular Fourth Amendment claim as well as on Mr. Hatheway's state law claims for false arrest and false imprisonment.

Finally, the court also rejected the qualified immunity defense asserted by Detectives Thies and McGuire. It reasoned that "the legal requirements for establishing the voluntariness of a person's consent to continued detention under these circumstances were clearly established on December 11, 1999, and . . . the situation at the substation on that date is not one in which an officer could have reasonably but mistakenly believed that Plaintiff's alleged consent was voluntary." Dist. Ct. Mem. Op. and Order, at 27.

## II. DISCUSSION

Detectives Thies and McGuire now appeal the denial of qualified immunity as to the claim arising out of their transporting Mr. Hatheway to the police substation and interrogating him there. The detectives do not challenge the district court's conclusion that they lacked probable cause to arrest Mr. Hatheway. Instead, they argue that Mr. Hatheway consented to the encounter.

In arguing that they are entitled to qualified immunity, the detectives contend that (1) the law was not clearly established as to whether Mr. Hatheway consented; (2) the record establishes that a reasonable officer would have

concluded that Mr. Hatheway consented; and (3) there are controverted factual issues rendering summary judgment in favor of Mr. Hatheway unwarranted. For the reasons set forth below, we are not persuaded by the first two arguments. We lack jurisdiction to consider the third argument, as should have been obvious to the defendants from our case law.

### A. Jurisdiction

Because the district court's May 30, 2002 order is interlocutory, resolving only some of Mr. Hatheway's claims against some of the defendants, our jurisdictional is extremely limited: we may only consider certain specific challenges to the district court's denial of qualified immunity to the defendant detectives. See Mitchell v. Forsyth, 472 U.S. 511, 528 (1985). In Mitchell, the Supreme Court applied the collateral order doctrine to the denial of public officials' motions for summary judgment on qualified immunity grounds. The Court held that public officials could appeal district court decisions that determined whether or not certain given facts demonstrate a violation of "clearly established" law. Johnson v. Jones, 515 U.S. 304, 311 (1995) (discussing Mitchell).

In spite of Mitchell's authorization of certain appeals involving the denial of qualified immunity, there remains a class of qualified immunity rulings not

immediately appealable.  See id. at 319-20.  In particular, "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether the pretrial record sets forth a 'genuine' issue of fact for trial."  Id.; see also Foote v. Spiegel, 118 F.3d 1416, 1422 (10th Cir. 1997) (discussing Johnson).  When the district court's summary judgment ruling merely determines the sufficiency of the evidence offered by the plaintiff in response to the defendant's factual assertions, the appeal is unlikely to involve the kind of abstract legal issues separate from the fact-related issues that will arise at trial.  Thus, many of the justifications for allowing the appeal of collateral orders are not present.  McFarland v. Childers, 212 F.3d 1178, 1183-84 (10th Cir. 2000).  See Johnson, 515 U.S. at 313-20.

Nevertheless, if a defendant's appeal of the denial of qualified immunity "is based on the argument that, even under the plaintiff's version of the facts, the defendant[s] did not violate clearly established law, then the district court's ruling is immediately appealable."  Johnson v. Martin, 195 F.3d 1208, 1214 (10th Cir. 1999).

Applying these principles, we conclude that we lack jurisdiction to consider the detectives' third argument—that the facts regarding Mr. Hatheway's alleged consent are controverted, and that, as a result, the district court should not have denied the detectives' request for qualified immunity on Mr. Hatheway's Fourth

-10-

Amendment claim arising out of their transporting him to the police substation and interrogating him there. That argument concerns the sufficiency of the evidence offered by Mr. Hatheway in response to the detectives' factual assertions and does not raise the kind of abstract legal issues that may be readily separate from fact-based ones. See McFarland, 212 F.3d at 1183-84.

However, we further conclude that this court does have jurisdiction over the two other arguments raised by the detectives. In particular, the detectives' argument that, at the time of the December 11, 1999 interrogation, the law was not clearly established regarding the factors necessary to determine consent raises an abstract legal issue that we may consider in an interlocutory denial-of-qualified-immunity appeal. As to their remaining argument, we read the detectives' appellate brief as arguing that, even when the record is viewed in the light most favorable to Mr. Hatheway, a reasonable officer would conclude that he consented to the interrogation. That argument also involves an abstract legal issue that we may consider in an interlocutory appeal of the denial of qualified immunity. We therefore proceed to the merits of these arguments.

## B. Denial of Qualified Immunity

Qualified immunity is available to government officials when "their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time." Anderson v. Creighton, 483 U.S. 635, 639 (1987) (quoting Harlow, 457 U.S. at 819).

When, as here, the defendants have raised a qualified immunity defense in a summary judgment motion, the plaintiff must initially make a twofold showing, establishing that (1) the defendants' "alleged conduct violated the law," and (2) "'that the law was clearly established when the alleged violation occurred." Hinton v. City of Elwood, Kan., 997 F.2d 774, 779 (10th Cir. 1993) (quoting Pueblo Neighborhood Health Ctrs. v. Losavio, 847 F.2d 642, 646 (10th Cir. 1988)). "For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must be as plaintiff maintains." Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir. 2002) (internal quotation marks omitted). In other words, "[t]he contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Id.

If the plaintiff makes this twofold showing, the defendant then bears the

usual burden of a party moving for summary judgment to show "that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." Hinton, 997 F.2d at 779. In determining whether both parties have satisfied their respective burdens, we evaluate the evidence in the light most favorable to the non-moving party. Id.

Here, Mr. Hatheway's claim is grounded in the Fourth Amendment's prohibition of unreasonable seizures: he contends that the detectives and officers lacked probable cause to arrest him and transport him to the police substation and therefore violated the Fourth Amendment. See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000) (stating that "arrests . . . are characterized by highly intrusive or lengthy search or detention" and must be supported by probable cause) (internal quotation marks and citations omitted). As we have noted, Detectives Thies and McGuire have not challenged the district court's conclusion that they lacked probable cause to arrest Mr. Hatheway. Instead, they focus on the issue of Mr. Hatheway's alleged consent. In particular, they argue that (1) the law regarding consent was not clearly established and (2) a reasonable officer would have concluded that Mr. Hatheway consented to being transported to the police substation and interrogated there.

We need only briefly address the detectives' first argument. The detectives contend, in cursory fashion, that "[t]he law regarding voluntary consent was not

clearly established on December 11, 1999 so as to preclude the defense of qualified immunity." Aplts' Br. at 18. The detectives cite no authority in support of this proposition and do not explain precisely what was legally unclear.

Moreover, in assessing the issue of consent, the district court cited this circuit's decision in United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996). See Dist. Ct. Mem. Op. and Order, at 23. Sanchez was decided well before the December 11, 1999 interrogation of Mr. Hatheway, and it clearly sets forth the factors relevant to determining whether a police-citizen encounter is consensual. See also Kaupp v Texas, No. 02-5636, 2003 WL 2010974, at *2 (U. S. May 5, 2002) (per curiam) (concluding that suspect did not consent to interrogation by police and citing, inter alia, Dunaway v. New York, 442 U.S. 200, 212 (1979); Florida v Royer, 460 U.S. 491, 497 (1983); and Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). In light of this Supreme Court and Tenth Circuit precedent, we therefore conclude that the relevant law was clearly established when the detectives confronted Mr. Hatheway. See Farmer, 288 F.3d at 1259 (explaining when the law is "clearly established").

In support their second argument—that a reasonable officer would have concluded that Mr. Hatheway consented to being transported to the substation and questioned there—the detectives invoke two statements by Mr. Hatheway: (1) his statement to Detective McGuire that he would cooperate (made before he was

transported to the police substation); and (2) his signing of the Miranda waiver form at the substation. Neither statement supports the view that the encounter between Mr. Hatheway and the police was consensual.

As to Mr. Hatheway's statement, we note that the detectives appear to rely on their subjective view that Mr. Hatheway "seemed to fully agree" to being transported to the substation and questioned there. See Aplts' Br. at 12 (quoting Aplts' App. at 136). However, "[t]he subjective intentions or state of mind of either the defendant or police is irrelevant to Fourth Amendment analysis." Sanchez, 89 F.3d at 718 (citing Whren v. United States, 517 U.S. 806, 813 (1996) and United States v. Madrid, 30 F.3d 1269, 1276 (10th Cir. 1994)). Rather than the parties' subjective state of mind, the courts look to objective factors in determining whether an encounter between the police and a citizen is consensual:

> Courts have identified several factors that could lead a reasonable innocent person to believe that he is not free to disregard the police officer, including: the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed space; and absence of other members of the public.

Sanchez, 89 F.3d at 718.

Here, not one, but most of these factors directly undermine the detectives'
contention that Mr. Hatheway consented to being transported to the substation and
remaining there to answer questions. As he opened the door to his trailer, Mr.
Hatheway was confronted by several officers with guns drawn. "[P]olice officers
on each side of the steps to his trailer grabbed him by the wrists while he was at
the threshold of the door and pulled him out onto the grass in front of the trailer,"
Dist. Ct. Mem. and Order at 7, and the detectives and officers then placed him in
handcuffs. In light of these circumstances, Mr. Hatheway's alleged statement to
Detective McGuire— "I'll cooperate"—was patently insufficient to establish
consent in the view of a reasonable officer. See Kaupp, 2003 WL 2010974, at *2
(concluding that a suspect's saying "Okay" in response to an officer's statement
that "we need to go and talk" "is no showing of consent under the circumstances"
because the officer "offered [the suspect] no choice, and a group of police
officers rousing an adolescent out of bed in the middle of the night with the words
'we need to go and talk' presents no option but 'to go'").

As to the Miranda waiver, the detectives argument is similarly
unpersuasive. Although the waiver form recites Mr. Hatheway's Miranda rights,
it does not mention the right to be free from an arrest without probable cause or
the right to terminate a consensual encounter. There is no statement in the waiver
form informing Mr. Hatheway that he had the right that he would have had if the

encounter was truly consensual: the right to terminate the interrogation and walk out of the police station at anytime.

Moreover, several of the <u>Sanchez</u> factors also undermine the contention that the interrogation was consensual. Detective Thies used some harsh language and at one point told Mr Hatheway to "shut up." Aplts' App. at 87-88. As the district court noted, the detectives impounded Mr. Hatheway's car and retained possession of his keys during the interrogation. Mr. Hatheway thus did not have a convenient means of leaving the substation. Finally, the questioning at the substation was "in a nonpublic interrogation room and [Mr. Hatheway] was not even allowed to go to the bathroom without an officer escorting him." Dist. Ct. Mem. Op.and Order at 26.

Most importantly, the detectives' argument ignores the fact that Mr. Hatheway repeatedly asked to go home and Detective McGuire expressly declined to honor that request. In light of Mr. Hatheway's requests, no reasonable officer would have concluded that Mr. Hatheway consented to remaining at the substation.

.

## III. CONCLUSION

We therefore AFFIRM the district court's denial of qualified immunity to

Detectives Thies and McGuire on Mr. Hatheway's Fourth Amendment claim arising out of his being transported to the police station and interrogated there. We further note that the appellants' arguments have little basis in law or fact. Appellants and their counsel are reminded of an attorney's obligations under 10th Cir. R. 46.5(2) and (3).[3]

---

[3] 10th Cir. R. 46.5(B)(2) and (3) provide that an attorney's presenting a brief to the court constitutes a certification that "the issues presented are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or establishing new law" and that "the factual contentions or denials are supported in the record."