In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3955

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JERMARCUS ROBINSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:08-CR-74—**Theresa L. Springmann**, *Judge.*

ARGUED MAY 25, 2010—DECIDED AUGUST 10, 2010

Before FLAUM, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Riding around in a car with cocaine in one's pocket is not, generally speaking, a good idea, given the myriad reasons why the police might legitimately stop the vehicle. A stop based on a traffic violation is what tripped up Jermarcus Robinson on the afternoon of June 16, 2008. Robinson was a passenger in the car driven by his friend David Robinson (no relation) that day. (We refer to the defendant as

Robinson and to his friend as David Robinson.) One thing led to another after Officer Shane Pulver ordered the car to pull over, and before long, the police found a plastic bag with 54 grams of crack cocaine gripped between Robinson's buttocks. This prosecution for possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1) followed. The only question on appeal is whether there is some reason for suppressing the drugs Robinson was trying to hide. We conclude, as did the district court, that the answer is no, and thus that the conviction should stand.

**I**

We take our account of the facts from the district court's opinion on Robinson's motion to suppress, supplementing where helpful with information from the squad car's video of the stop. On the day in question, Officer Pulver, who had been with the Fort Wayne, Indiana, Police Department for four years, was on patrol around 3:00 in the afternoon. As he approached the intersection of Eckart and Abbott Streets, he spotted a dark-colored Ford Taurus. The driver gave him a strange look as the car passed by, prompting Pulver to check the license plate. The check reminded him that he knew David Robinson, the driver, and also that David Robinson was a habitual traffic violator who did not have a driver's license.

Pulver decided to follow up on that information and signaled the car to pull over. Around that time, he activated the car's video recording device. The fol-

lowing timeline continues the story; the times given reflect the 24-hour clock used by the police equipment:

14:58:58: Pulver initiates contact.

14:59:57: Pulver asks Robinson to put his hands on the roof of the car, because when Pulver peers into the car, he notices that Robinson (who was squirming around oddly) had a folded pocket knife visible in his front left pocket. Pulver takes the knife; he notices that the knife has an off-white residue on it.

15:00:04: Two women (Robinson's sister Velma and his girlfriend Sunny Thompson) drive up and park in front of David Robinson's car; they get out of their car and begin walking toward Pulver and Robinson.

15:00:37: Pulver begins a pat-down search of Robinson. Robinson straightens out and tightens his muscles. During this initial search, Pulver gets what he later describes as a quick, brief feel of something hard near Robinson's backside, but then he "loses it." He later says that he did not at that time know what the object was but that he thought it was not a weapon.

15:01:12: Officer Franceus joins Pulver at the scene.

15:01:40: Pulver interrupts his pat-down of Robinson. Robinson walks over to the rear of the car with Franceus, and Pulver begins searching the car. Pulver also speaks briefly to Velma and Sunny.

15:02:20: The two women walk back to their own car.

15:02:36: As Pulver searches the car, he spots a small CD-case-style digital scale that also has visible white

residue on it, tucked between the passenger seat and the center console. Pulver then handcuffs Robinson and continues with his pat-down, in part to follow up on the hard object he had already detected.

15:03:33: Pulver detects a hard object wedged in Robinson's buttocks.

15:03:43: Pulver spins Robinson around onto the hood of the police car. With Franceus, he restrains Robinson and moves him to the ground.

15:04:06: Velma starts yelling at Pulver and returning to David Robinson's car.

15:04:28: Pulver handcuffs Velma.

15:05:50: Donning latex gloves, Pulver pulls a bag of crack from Robinson's clenched buttocks; the bag breaks a bit as Pulver tosses it onto the car, spilling a small amount of the contents.

Several things are notable about this sequence. First is how quickly it unfolded. Less than seven minutes elapsed from the time when Pulver initiated contact to the time when he pulled the baggie with cocaine away from Robinson. Second is the fact that the two officers were attempting to secure the scene at the same time as Velma and Sunny were intervening. Third is the way that the evidence of illegal activity accumulated.

Looking at the totality of the circumstances, the district court drew several conclusions. First, the court found that the initial search of Robinson was a search incident to an arrest that was justified by probable cause

to believe that Robinson had committed the felony of possession of narcotics. Second, and in the alternative, the court decided that from the outset Robinson posed enough of a threat to officer safety—largely because of the pocket knife that Pulver saw in plain view—that a pat-down was justified, see *Terry v. Ohio*, 392 U.S. 1 (1968). Once Pulver felt the hard object during the initial pat-down, he was entitled to return to Robinson after he checked out the car to confirm that the hard object concealed on Robinson was not a weapon. Third, the court found that the vehicle search was authorized under the Supreme Court's decision in *Arizona v. Gant*, 129 S. Ct. 1710 (2009). Finally, it held that the last part of Pulver's search of Robinson was not a strip search and that the removal of the illegal drugs from his buttock area was justified.

Having lost his motion to suppress, Robinson entered into a conditional plea agreement on August 18, 2009. Later he was sentenced to 120 months in prison, to be followed by five years of supervised release. His appeal is limited to the issues surrounding the motion to suppress. (He has abandoned any claim that this was an impermissible strip search, and so we do not address that argument.)

## II

We begin with a number of points that Robinson does not dispute. First, Officer Pulver's initial stop of the car was beyond reproach, because he had probable cause to believe that David Robinson was driving without a

license in violation of Indiana law. Second, Robinson concedes that Pulver was entitled to frisk him, even though he was just a passenger in the vehicle. Third, he admits that if the police were entitled to take into account the digital scale that Pulver found during the brief search of the car that he conducted, then there would be at a minimum reasonable suspicion, and perhaps even probable cause, for the final search of Robinson that revealed the cocaine.

Robinson's position is that the events we have recounted above must be divided into three distinct stages, and that the police should have released him after Stage 1. During Stage 1, as he sees it, the police were entitled to, and did, stop and frisk him. They had seen his knife in plain view, and thus were authorized by *Terry* to make sure that he had nothing else in his possession that would endanger their safety. See *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). Stage 1 ended, however, when Officer Pulver found nothing beyond the knife that he had spotted right away. At that point Pulver decided to look again at the car, signaling (Robinson says) that Robinson was no longer a person of concern. Robinson takes the position that he should have been free to leave then, and that he would have gone off quietly with his sister. Stage 2, the search of the car, was not authorized by *Gant,* Robinson believes, because the police may perform a search of the inside of a vehicle incident to arrest only if the arrestee is close enough or if there is reason to believe that the vehicle will contain evidence of the offense leading to the arrest. Neither of those is true here,

Robinson argues: he was not arrested until after the search of the car, and so the vehicle search was not incident to his arrest; furthermore, there was no evidence in the car that related to David Robinson's offense of driving without a license. Without the critical evidence from the car, he concludes, Pulver would have had no reason to return to Robinson and perform the intrusive search during Stage 3 that turned up the cocaine. If, however, Pulver was entitled to search the car, then Robinson concedes that the additional evidence provided by the scale was enough (taken with the other evidence the police already had) to support probable cause to arrest him.

If these events had dragged out over a longer period, then Robinson's account might be more persuasive. Similarly, we might be more inclined to see things his way if Velma and Sunny had not been hovering just steps away and becoming increasingly agitated. But they were there, and this was a rapidly evolving situation. Critically, at the time Pulver stopped his initial frisk of Robinson and turned to the car, another officer was there who was able to (and did) keep an eye on Robinson. The district court, to whose factual findings we owe deference, was entitled to conclude that Pulver had handed off responsibility for Robinson to his partner, and to reject the hypothesis that Pulver had concluded his frisk and was satisfied that Robinson had no weapon.

The government emphasizes, in its argument, the fact that Robinson was not cooperating with Pulver's initial (Stage 1) frisk. Instead, he straightened up and tightened

his muscles in an effort to prevent the officer from detecting the hidden baggie. In response to a question from a member of the panel, Robinson's lawyer conceded that if a person had clenched his arms tightly by his side during a frisk, that action would prevent the officer from conducting an adequate initial search. He had no answer to the question why clenching another body part should be treated differently. The government also stresses a number of other facts that supported Pulver's decision to continue his pat-down of Robinson after he looked into the car: he had detected some kind of hard object but had not had time to identify it (even though he said that he thought it was not a weapon); at least one of the car doors was open and Velma and Sunny were nearby, and thus there was a need for the officers to ensure that there was nothing dangerous in the car; and Robinson (as well as Velma) was physically larger than the police officers.

Whether an officer has a reasonable suspicion to support a *Terry* frisk is a "fact-specific" inquiry that looks at the "totality of the circumstances" in light of "common sense and practicality." *E.g., United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006). The proper way to view this encounter with the police, we conclude, is as a single event, not two or three different stages. Pulver was not finished with his *Terry* frisk at the time he turned to the car; that is why he did not leave Robinson free to go, but instead turned over the job of watching Robinson to Franceus. As the timeline above shows, only a minute or so elapsed between when

Pulver interrupted his pat-down of Robinson to take another look at the car and when Pulver resumed the frisk. A minute into the resumed frisk, Pulver found the hard object between Robinson's buttocks again and took steps to retrieve it. By that time Robinson was actively resisting Pulver's efforts, Velma was yelling, and Franceus was assisting Pulver. Three minutes into the resumed frisk, Pulver pulled the bag of crack away from Robinson and threw it onto the hood of the squad car.

In our opinion, it is not necessary to rely on the fact that Pulver spotted the scale in the car to justify his decision to resume searching Robinson. In addition, we see no need to reach the government's argument that the cocaine would inevitably have been discovered. The latter seems unlikely, if Pulver had been satisfied with his initial frisk of Robinson and Robinson had then walked off with Velma and Sunny. (In other words, there is no need to speculate about Robinson's ability to drive off in David Robinson's car, because he had another ride standing by.) But Pulver was not satisfied with his initial effort to pat down Robinson, and so he was entitled to return to finish the job within the bounds outlined in *Terry*. Finally, just because he indicated after the fact that his initial impression was that the hard object he felt for an instant during the first phase was not a weapon, objectively speaking something hard might have been harmful, and Pulver was entitled to assure himself that his first impression was correct. See *United States v. Brown*, 188 F.3d 860, 866 (7th Cir. 1999).

For these reasons, we conclude that the district court correctly refused to suppress the cocaine that the officers pulled from Robinson's person. We therefore AFFIRM the judgment of the district court.