In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-4082

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER J. TINNIE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 09 CR 50017—**Philip G. Reinhard**, *Judge.*

ARGUED SEPTEMBER 8, 2010—DECIDED JANUARY 18, 2011

Before POSNER, MANION, and HAMILTON, *Circuit Judges.*

MANION, *Circuit Judge.* During a traffic stop, a deputy sheriff frisked the car's passenger, Christopher Tinnie, and discovered a gun and ammunition. A grand jury indicted Tinnie for possession of a firearm by a felon. Tinnie sought to suppress the gun, ammunition, and statements he made following his arrest. The district court denied his motion to suppress and Tinnie then entered a conditional plea of guilty. Tinnie now appeals

from the district court's denial of his motion to suppress. We affirm.

I.

On Friday, January 30, 2009, Winnebago County Sheriff Deputies Dennis Hill and Brad Kaiser were working a 4:00 p.m.-4:00 a.m. shift, patrolling in a "weed and seed area" of Rockford, Illinois. A "weed and seed area" is an area designated by state and local officials based on a high crime rate and gang, drug, and gun activity. Kaiser was part of a Special Focus Unit which focused on areas with higher crime tendencies. At around 11:30 that evening, the officers observed a black Hyundai Sonata with a mass of air fresheners hanging from its rearview mirror. That normally might not attract law enforcement's attention, but the strategy in a "weed and seed area" is proactive policing through increased traffic enforcement, and the hanging air fresheners constituted an "obstructive view" justifying a stop. Before the officers stopped the car, though, the driver abruptly turned left and then into a driveway. The officers testified that they believed the driver was attempting to avoid being stopped.

After stopping the vehicle, the officers approached the car. As he walked up to the passenger side, Kaiser noticed Tinnie fidgeting left to right and back and forth in the passenger's seat. While Hill spoke with the driver, Kaiser asked Tinnie for his identification. Tinnie responded that he didn't have a license but did have an identification card. But then when Kaiser asked for

that, Tinnie merely moved his hands down the front of his coat and pinched his jeans (he did not actually put his hands inside his coat or pants pockets to check) before saying he did not have an identification card. Kaiser commented that Tinnie had never actually checked his pockets for his identification card, but Tinnie merely responded that "he didn't have his ID on him." The officer then asked the passenger for his name, birth date, and age. Tinnie identified himself as Christopher Tinnie, gave a birth date of June 16, 1981, and told the officer that he was 28. But as Kaiser immediately realized, "with the date of birth that he had given me, he could have only been 27 at the time." And at the suppression hearing, Kaiser explained that, in his experience, individuals who are unable to provide the correct age to match their birth date are lying either about their name or their date of birth.

At this point, Kaiser told Tinnie to exit the car. Kaiser later testified that at the time he asked Tinnie to get out of the car he had already decided to frisk him and in fact that he frisks anyone he asks to exit a vehicle during a traffic stop. After Tinnie exited the car, Kaiser informed Tinnie he "was going to pat him down for officer safety" and asked "him if he had anything on him that he shouldn't have as far as weapons or drugs." Tinnie didn't respond. Kaiser slightly rephrased the question, asking Tinnie if he had any weapons, guns, or anything that would poke Kaiser's hand. Again, Tinnie did not answer. But when Kaiser questioned Tinnie a third time, asking solely whether he had any drugs, "Tinnie immediately said 'no.'" At this point, Kaiser proceeded

to frisk Tinnie and discovered a gun and a magazine with three rounds of ammunition. The officers arrested Tinnie, and after a search of the car revealed no other weapons or drugs, they gave the driver a warning about the obstructed view and allowed her to leave.

The officers transported Tinnie to the Winnebago County Criminal Justice Center where, according to Hill, he Mirandized Tinnie. Tinnie then voluntarily provided a handwritten and initialed statement acknowledging his possession of the firearm. A grand jury later indicted Tinnie for possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Tinnie moved to suppress the gun, ammunition, and his written statement. He argued the frisk was unconstitutional and the written statement was the fruit of the illegal search and also obtained without the benefit of a *Miranda* warning. The district court denied the motion to suppress, concluding reasonable suspicion justified frisking Tinnie and that Tinnie had in fact received a *Miranda* warning. Tinnie then entered a conditional plea of guilty, reserving the right to appeal the denial of his motion to suppress and the sentence imposed. The district court then sentenced Tinnie to 84 months in prison. Tinnie appeals.

II.

On appeal, Tinnie claims that the district court erred in denying his motion to suppress because reasonable suspicion did not justify the frisk and therefore the fruit

of the illegal search (i.e., the gun, ammunition, and his later inculpatory statement) was inadmissible.[1] We review *de novo* the district court's legal determination of the constitutionality of a frisk and its findings of fact for clear error. *United States v. Oglesby*, 597 F.3d 891, 893 (7th Cir. 2010).

During a valid traffic stop, an officer may order the driver and passengers out of the vehicle without violating the Fourth Amendment. *Pennsylvania v. Mimms*, 434 U.S. 106, 112 n.6 (1977); *Maryland v. Wilson*, 519 U.S. 408, 412 (1997). The officers may also frisk the driver and any passengers upon reasonable suspicion that they may be armed and dangerous. *Arizona v. Johnson*, 129 S.Ct. 781, 787 (2009). Whether an officer has a reasonable suspicion to support such a frisk "is a fact-specific inquiry that looks at the 'totality of the circumstances' in light of common sense and practicality." *United States v. Robinson*, 615 F.3d 804, 807-08 (7th Cir. 2010). In determining whether an officer had reasonable suspicion, courts consider "the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). The time and the location of the stop are also

---

[1] Tinnie does not challenge the district court's conclusion that he received his *Miranda* warnings prior to providing his written statement. This issue is thus not on appeal. Tinnie also does not challenge his sentence on appeal, although he had reserved the right to do so in his conditional plea.

relevant to the reasonable suspicion inquiry. *Oglesby*, 597 F.3d at 893.

In this case, the totality of the circumstances justified frisking Tinnie. The stop occurred late on a Friday night in a high-crime neighborhood. And Kaiser testified at the suppression hearing that the driveway into which Tinnie had pulled was "dimly lit just from road lighting." *See, e.g., Oglesby*, 597 F.3d at 893 (holding that the totality of the circumstances justified a frisk, in part, because it "occurred at night in a location that was known to the officers to be a high-crime area plagued by drug trafficking and gun violence"). Kaiser was part of a Special Focus Unit charged with patrolling higher crime areas and, as the district court found, was thus familiar with the risk of gun possession in that area. *See United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (holding that the experience of the officer is a factor considered in judging whether reasonable suspicion justifies a frisk). As the district court also found, Tinnie acted suspiciously by moving around nervously as the officers approached the car. *See, e.g., United States v. Brown*, 273 F.3d 747, 748-49 (7th Cir. 2001) (finding that the totality of the facts, including the defendant's "movements in the car," justified "a limited patdown for weapons"). Then, after stating he had an identification card, Tinnie told Kaiser (without checking his pockets) that he did not have the identification card. *See, e.g., Cady v. Sheahan*, 467 F.3d 1057, 1061-62 (7th Cir. 2006) (noting that evasive responses to police questions can help support reasonable suspicion). Tinnie also stated

he was 28 and Kaiser immediately perceived that "with the date of birth that he had given me, he could have only been 27 at the time." *See, e.g., United States v. Marrocco*, 578 F.3d 627, 633-34 (7th Cir. 2009) (concluding that inconsistent answers to the officer's questions was a factor supporting reasonable suspicion that a suitcase contained drugs); *United States v. Thomas*, 87 F.3d 909, 912 (7th Cir. 1996) (stating that defendant's contradictory answers to simple questions was a factor supporting reasonable suspicion justifying detention of defendant's suitcase.) And before frisking Tinnie, Kaiser asked him whether he had any weapons or drugs and Tinnie did not respond. Kaiser rephrased the question slightly, asking Tinnie "if he had any weapons on him, any guns, or anything that would poke my hands." Again, Tinnie did not respond, but when Kaiser then asked if Tinnie had any drugs on him, Tinnie immediately said no. Coupled with the earlier suspicious circumstances, Tinnie's silence when twice asked if he had any weapons, but his immediate denial of possessing drugs, provided Kaiser with reasonable suspicion that Tinnie was armed and thus justified the frisk.

It is true that Kaiser testified that when he asked Tinnie to step out of the car, he had already decided to frisk him. The district court believed the high-crime neighborhood and the lateness of the hour, along with Tinnie's suspicious movement as the officers approached the car, his strange behavior when asked for his identification, and the inconsistent date of birth and age were enough to justify the frisk. That may well be,

given that we judge the totality of the circumstances "in light of common sense and practicality." *Robinson*, 615 F.3d at 807-08. Common sense tells us that an officer faced with Tinnie's suspicious behavior during a late-night stop in a high-crime neighborhood would find it totally sensible to perform a frisk to protect himself and his partner. *See, e.g., Oglesby*, 597 F.3d at 893 (holding frisk justified where it "occurred at night in a location that was known to the officers to be a high-crime area plagued by drug trafficking and gun violence" and where defendant moved away from the crowd as officers approached and dropped his hand to his pants pocket). But we need not rest on those circumstances because Kaiser testified at the suppression hearing that before he frisked Tinnie, he had asked Tinnie whether he had any weapons or drugs. And as recounted above, Tinnie did not respond to the repeated questions about weapons but immediately responded "no" when asked about drugs. The Supreme Court has made clear that in judging the constitutionality of a search or seizure, courts must look at the facts objectively. *United States v. Whren*, 517 U.S. 806, 812-13 (1996) (collecting cases). Thus, "[i]t is important to remember that *we are not limited* to what the stopping officer says or *to evidence of his subjective rationale*; rather, we look to the record as a whole to determine what facts were known to the officer and then consider *whether a reasonable officer in those circumstances* would have been suspicious." *United States v. Brown*, 232 F.3d 589, 594 (7th Cir. 2000) (internal quotation marks and citations omitted; emphasis added). Thus, it is irrelevant that Kaiser decided to frisk Tinnie before

directing him to exit the car. Similarly, it is also irrelevant that Kaiser testified that he frisks anyone he asks to step out of a vehicle during a traffic stop.[2] The question is rather whether given all of the facts known to Kaiser, a reasonable officer would have believed the frisk was justified. Given everything that took place prior to

---

[2] Tinnie argues that because Kaiser routinely frisks occupants whom he has directed to exit the vehicles, Kaiser engages in unconstitutional automatic frisks. There are two flaws with this argument: First, as just noted, the reasonable suspicion analysis is an objective one—so Kaiser's subjective intent is irrelevant. Second, Kaiser did not testify that he routinely asks everyone he stops to exit the vehicle. Thus, it may well be that Kaiser only directs occupants to exit the stopped vehicle if there is already reasonable suspicion to believe they are armed and dangerous. The dissent finds this possibility highly improbable but, as the dissent recognizes, many routine traffic stops occur "while the drivers and passengers remain inside the vehicle (and are often warned *not* to try to exit the vehicle)." Dissent at 14 n.3. There is nothing to indicate that Kaiser handles traffic stops any differently than the typical officer, i.e., in most cases directing drivers and passengers to remain inside the vehicle. But if, in fact, there was some evidence that Kaiser has a higher rate of exit-requests and frisks than the typical officer, it likely stems from the more dangerous environment he faces in working the 4 p.m.-4 a.m. shift as a member of the Special Focus Unit, patrolling high-crime neighborhoods. Absent some support in the record to the contrary, we should not imply that Kaiser regularly engages in unconstitutional conduct.

the frisk,[3] as well as the time and location of the stop, a reasonable officer could conclude that there was reasonable suspicion that Tinnie was armed and that a frisk was necessary to assure the officers' safety. Accordingly, the frisk was constitutional and the district court properly denied Tinnie's motion to suppress.[4] We AFFIRM.

---

[3] The dissent asserts that because "[t]he frisk had begun by the time Deputy Kaiser asked Tinnie whether he had any weapons or drugs," his responses are irrelevant to the *Terry* analysis and should be disregarded. Dissent at 24. However, the record makes clear that Kaiser asked Tinnie whether he had any weapons or drugs before the frisk had begun; Kaiser testified at the suppression hearing that this questioning took place before he "touched [Tinnie], before any interaction with his body took place." And the district court found—and that finding was not clearly erroneous—that this questioning occurred before Kaiser conducted the frisk.

[4] While there may well be other cases in which officers engage in unreasonably intrusive law enforcement practices, Dissent at 28, this is not that case. Rather, this case illustrates how proactive policing, within constitutional limits, successfully "weeds" dangerous criminals from the street while providing law-abiding citizens the protection they deserve.

HAMILTON, *Circuit Judge*, dissenting. The erosion of Fourth Amendment liberties comes not in dramatic leaps but in small steps, in decisions that seem "fact-bound," case-specific, and almost routine at first blush. Taken together, though, these steps can have broader implications for the constitutional rights of law-abiding citizens. I see this case as an unfortunate example of this process. The immediate result here is the removal of an armed felon from the streets of Rockford, Illinois for seven years. But the court's decision to sanction Deputy Kaiser's frisk of defendant Tinnie comes too close to allowing police officers to frisk virtually at will any driver or passenger pulled over in a high-crime area. I believe the Fourth Amendment requires a different balance between the interests of efficient law enforcement and the constitutional right against unreasonable searches, so I respectfully dissent.

Before turning to the frisk itself, let's consider the series of events that led to that frisk, beginning with the actual stop of the car in which Tinnie was a passenger. The stated reason for the stop—to address a windshield obscured by air fresheners hanging from the rear-view mirror—was pure pretext, of course. No one believes that Deputy Kaiser and his partner cared about the obscured windshield for its own sake. Deputy Kaiser characterized this stop as the work of a proactive policeman implementing the federally-funded "Weed and Seed" program at night in a designated high-

crime area.[1]

The officers took advantage of the fact that the Fourth Amendment allows pretextual traffic stops so long as they are based upon an observed violation of a traffic law. See *Whren v. United States*, 517 U.S. 806, 810 (1996). As this case shows, this principle is practically limitless in application—only the most unobservant police officer would be unable to spot at least one traffic violation in short order. See David Harris, *"Driving While Black" and All Other Traffic Offense: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544, 545, 558-59 (1997) ("In the most literal sense, no driver can avoid violating some traffic law during a short drive, even with the most careful attention"; "with the traffic code in hand, any officer can stop any driver any time"); Barbara C. Salken, *The General Warrant of the Twentieth Century? A Fourth Amendment Solution to Unchecked Discretion to Arrest for Traffic Offenses*, 62 Temp. L. Rev. 221, 223 (1989) ("Almost every American adult drives; hence the pool of potential arrestees is enormous. The innumerable rules and regulations governing vehicular travel make it difficult not to violate one of them at one time

---

[1] The "Weed and Seed" program is a U.S. Department of Justice initiative designed to "reduce the impact of violent crime on communities; provide prevention, intervention, and treatment services for substance abuse and other social problems; and revitalize communities through improved housing and economic development" by "stress[ing] collaboration, coordination, and community participation." U.S. Department of Justice, *Weed & Seed Implementation Manual*, at 1 (2005).

or another." (footnote omitted)).[2] As a practical matter, *Whren* allows law enforcement officers to conduct traffic stops nearly at will. See, *e.g.*, *People v. Robinson*, 767 N.E.2d 638, 660 (N.Y. 2001) (Levine, J., dissenting) ("[A] persevering police officer, armed only with a copy of the [traffic code] and bent on subjecting a vehicle and its occupants to an unjustified investigative stop, will ultimately be able to accomplish that objective virtually *at will*.").

Once the car was stopped, Deputy Kaiser began questioning Tinnie, at first supposedly to determine his identity. Again, no one seriously believes that this was the primary purpose of the questioning—Deputy Kaiser was almost certainly looking for a reason to search Tinnie, the car, or both. Otherwise, why would Deputy Kaiser have reacted as he did to Tinnie's rounding up of his age from 27 years and 7 months to 28 years? Based on Tinnie's answers to those questions, Deputy Kaiser ordered Tinnie out of the car. Of course, Tinnie's actual answers to Deputy Kaiser's initial questions were irrelevant, given that Deputy Kaiser could, as a matter of course, order Tinnie out of the car without any

---

[2] This observation long predates the decision in *Whren*. When he was Attorney General, the future Justice Jackson said: "We know that no local police force can strictly enforce the traffic laws, or it would arrest half the driving population on any given morning." R. Jackson, *The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys*, April 1, 1940, quoted in *Morrison v. Olson*, 487 U.S. 654, 727-28 (1988) (Scalia, J., dissenting).

suspicion beyond that which justified the initial stop. See
*Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (describing
this additional intrusion as "minimal").[3]

By this point, Deputy Kaiser testified, he had already
decided that he was going to frisk Tinnie. In fact, Deputy
Kaiser's standard practice is to frisk *every* person he
orders out of a vehicle during a traffic stop—a practice
flatly contrary to *Terry v. Ohio*, 392 U.S. 1, 27 (1968), and
its progeny, which require reasonable suspicion that a
suspect is armed and dangerous. The fact that Deputy
Kaiser applied an unconstitutional practice in this case
is irrelevant if he in fact had a reasonable suspicion
that Tinnie was armed and dangerous, however, so we
must turn a blind eye to Deputy Kaiser's general prac-
tice, despite its similarity to practices under the colonial-
era general warrants authorizing searches of any "sus-
pected persons" or "suspicious places." See Thomas Y.
Davies, *Recovering the Original Fourth Amendment*, 98
Mich. L. Rev. 547, 558 n. 12 (1999).

When viewed in isolation, each individual aspect of
Deputy Kaiser's behavior before he started the frisk
that discovered the handgun was either arguably rea-
sonable or constitutionally irrelevant. "[T]he central
inquiry under the Fourth Amendment," however, is "the

---

[3] Deputy Kaiser had no real need to order Tinnie out of the car,
of course. Many routine traffic stops, particularly those actually
carried out for their stated purposes, proceed while the
drivers and passengers remain inside the vehicle (and are
often warned *not* to try to exit the vehicle).

reasonableness in *all* the circumstances of the par-
ticular governmental invasion of a citizen's personal
security," *Terry*, 392 U.S. at 19 (emphasis added). The
issue becomes whether Deputy Kaiser's frisk of Tinnie
was objectively reasonable in light of the fact that
the frisk was conducted only after Deputy Kaiser had
leveraged a pretextual stop for an insignificant traffic
offense into an excuse to remove Tinnie from the vehicle.

When taken together, Deputy Kaiser's actions apart
from the frisk itself already bear a striking resemblance
to the practices permitted in colonial times under
"the general warrant, the practice upbraided by the
colonists because it allowed British soldiers to con-
front anyone they felt like investigating for sedition
or trafficking in uncustomed goods." Christopher
Slobogin, *Justice Ginsburg's Gradualism in Criminal Proce-
dure*, 70 Ohio St. L.J. 867, 886 (2009); see also Davies, 98
Mich. L. Rev. at 558 & n. 12 (noting that the warrant
clause of the Fourth Amendment was for the purpose of
prohibiting general searches based on inadequate infor-
mation); David A. Harris, *Car Wars: The Fourth Amend-
ment's Death on the Highway*, 66 Geo. Wash. L. Rev. 556,
574 (1998) (noting that post-*Whren* Fourth Amendment
jurisprudence effectively allows law enforcement "to do
exactly what is otherwise forbidden: act on nothing
more than a hunch"). The effects that such long-con-
demned practices have on law-abiding citizens—fear,
humiliation, anger, and a growing cynicism toward
law enforcement in general—should come as no surprise.
See David A. Harris, *The Stories, the Statistics, and the
Law: Why "Driving While Black" Matters*, 84 Minn. L. Rev.

265 (1999) (drawing on interviews and statistical analyses of police practices).

Turning to the frisk itself, we must recognize that a frisk is most certainly not a minor intrusion on privacy. As the Supreme Court explained in *Terry*, which first authorized warrantless stop-and-frisks on less than probable cause (and shortly after some of the most violent urban riots in American history in 1967 and 1968), a frisk "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment." 392 U.S. at 17; see *id.* at 17 n.13 (describing a frisk as a "'thorough search . . . of [an individual's] arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet'"), quoting Priar & Martin, *Searching and Disarming Criminals*, 45 J. Crim. L. Criminology & Police Sci. 481 (1954).

*Terry* authorized frisks as a reasonable and pragmatic response to hard realities of our nation's city streets. But *Terry* nevertheless emphatically refused to authorize frisks of just any suspicious person. The Supreme Court authorized such intrusive searches only in those narrow circumstances in which a police officer "has reason to believe that he is dealing with an armed and dangerous individual." *Id.* at 27. Probable cause to arrest is not required, nor need the officer be "absolutely certain" that the person is armed, but "a reasonably prudent man in the circumstances [must] be warranted in the belief that his safety or that of others was in danger." *Id.* In a companion case to *Terry*, the Supreme

Court emphasized this need for specific facts indicating danger:

> The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.

*Sibron v. New York*, 392 U.S. 40, 64 (1968) (explaining reversal of conviction based on results of unjustified frisk). Frisks are "not to be undertaken lightly." *Terry*, 392 U.S. at 17.

The need for a reasonable suspicion that the subject is "armed and dangerous"—not merely suspicious in general—is key to this case, and helps to distinguish legitimate protective frisks from the abuses the Fourth Amendment was intended to limit. See *Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009) ("[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and danger-ous."). A review of the facts as found by the district court, as well as decisions by this and other circuits, shows that Deputy Kaiser simply lacked sufficient con-stitutional grounds to subject Tinnie to the intrusion and indignity of a frisk.

For starters, when Deputy Kaiser approached the car, he did not know anything about the driver or the pas-

senger. He had no reason to believe that either was inher-
ently more dangerous than any other motorist he
might encounter during a traffic stop. See *Ybarra v.
Illinois*, 444 U.S. 85, 93 (1979) (finding insufficient facts
to justify frisk, taking into account fact that police did not
"recognize [the defendant] as a person with a criminal
history"); *United States v. Thomas*, 512 F.3d 383, 388 (7th
Cir. 2008) (upholding frisk where officer "was concerned,
based on prior information, that Thomas was armed").
Nor was this traffic stop carried out for an offense "so
suggestive of the presence and use of weapons that a
frisk is always reasonable." *United States v. Barnett*, 505
F.3d 637, 640 (7th Cir. 2007) (reversing grant of motion
to suppress where officer frisked suspect in burglary
that likely involved a weapon); see also *Terry*, 392 U.S.
at 28 (deeming frisk justified where officer reasonably
suspected preparations for armed robbery). As a result,
Deputy Kaiser's frisk can be justified, if at all, based
only on his interactions with Tinnie.

Turning to those interactions, as Deputy Kaiser ap-
proached the car's passenger side, he saw Tinnie "fid-
geting" and acting "as if he was uncomfortable or just
readjusting." Deputy Kaiser asked for Tinnie's identifica-
tion. Passenger Tinnie said he did not have a driver's
license, so Deputy Kaiser asked him for his ID card. In
response to this request, Tinnie ran his hands down
his coat and pinched the top of his blue jeans before
responding that he did not have his ID card with
him either. Deputy Kaiser then asked for Tinnie's name,
date of birth, and age. Tinnie responded with his (cor-
rect) date of birth but gave his age in years at his next

birthday, not that day. Throughout the encounter, Tinnie was cooperative, according to Deputy Kaiser, and he gave no indication that he was armed. Unlike so many other frisk cases, Deputy Kaiser never observed any bulges in Tinnie's clothing indicating that he might be concealing a weapon. Regardless, Deputy Kaiser ordered Tinnie out of the car, escorted him to the back of the vehicle, and announced that he was going to frisk him for officer safety.

The district court found that those facts alone were sufficient to justify the frisk. My colleagues say they tend to agree, without quite holding as much. I address below the district court's and the majority's reliance on Deputy Kaiser's questioning as he began to frisk Tinnie to justify the frisk itself. For the moment, though, let's focus on what occurred before the frisk began: in a high-crime area at night, a passenger moves or adjusts his position as the police approach, seems nervous, gives an age and birth date that do not quite match, and when asked for ID, runs his hands along his pants and pinches them before saying he does not have any identification on his person. Suspicious? Yes. A reasonable indication that the passenger is armed and dangerous? No.

Recall that Tinnie and the driver were not suspected of or stopped for a violent crime, drug trafficking, or any other crime connected to a threat of violence. The stop was for air fresheners obstructing the windshield. Although Tinnie acted nervous when confronted, nervousness is, for obvious reasons, "of limited value in assessing

reasonable suspicion." *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010); *United States v. Urrieta*, 520 F.3d 569, 577 (6th Cir. 2008) ("Although nervousness may be considered as part of the overall circumstances giving rise to a reasonable suspicion, this court has found nervousness inherently *unsuspicious*, and has therefore given it very limited or no weight in the reasonable-suspicion calculation."); *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005) (same); *United States v. Portillo-Aguirre*, 311 F.3d 647, 656 n. 49 (5th Cir. 2002) (noting that courts "often give little or no weight to an officer's conclusional statement that a suspect appeared nervous"); *United States v. Jones*, 269 F.3d 919, 928 (8th Cir. 2001) (same); see also *United States v. Richardson*, 385 F.3d 625, 630-31 (6th Cir. 2004) (noting that nervousness is "especially" tenuous support for a frisk made "in the context of a traffic stop"). However nervous Tinnie might have appeared, he never moved as if he were reaching for a concealed weapon. And his nervous pinching and feeling of his pants before saying he had no ID with him is certainly not a reasonable basis for concluding that he was armed and dangerous.

The additional fact that Deputy Kaiser encountered Tinnie "late at night in a high-crime neighborhood" did not change these circumstances enough to justify a frisk. While context is certainly important to the totality-of-the-circumstances analysis, neither the lateness of the hour nor the nature of the locale automatically transforms non-threatening acts into indicators of danger. Perhaps the lateness of the hour would be significant if darkness had limited Deputy Kaiser's ability to see what

Tinnie was doing—an officer making a traffic stop is certainly entitled to exercise greater caution when a suspect's actions are veiled in shadow. Cf. *Ybarra*, 444 U.S. at 92 (noting, in overturning frisk, that "the lighting was sufficient" for law enforcement to see the individuals in the tavern where the frisk was conducted). But nothing in the record indicates that Deputy Kaiser had any actual difficulty seeing Tinnie at any time. There was, after all, enough light for him to see Tinnie shift around in his seat and pinch the leg of his pants.

I ascribe equally little significance to the fact that Tinnie was confronted in a high-crime area "designated by state and local officials." While "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis," *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000), there still needs to be a reasonable connection between the neighborhood's higher crime rate and the facts relied upon to support a frisk. In other words, we should ask, for example, whether Tinnie's behavior was consistent with that of the violent criminals known to frequent that area. Cf. *Terry*, 392 U.S. at 22-23 (noting how defendant's non-criminal behavior appeared suspicious when viewed in context). Unless we require at least some such connection, we give law enforcement the impression that frisks will receive much less scrutiny when performed in high-crime areas. That is particularly problematic in this case, where the designated "high-crime area" occupied *half* of the city of Rockford.

Setting aside these problems, the district court and my colleagues seek to justify the frisk by relying on Tin-

nie's responses to three questions Deputy Kaiser posed as he began the frisk. After telling Tinnie that he was about to be frisked for officer safety and walking him to the rear of the car, Deputy Kaiser asked whether Tinnie had any weapons or drugs in his possession. Tinnie did not immediately respond. Deputy Kaiser then asked if Tinnie had any weapons, guns, or things that would poke the deputy's hands, and again Tinnie did not respond. Deputy Kaiser then asked Tinnie if he had any drugs, and Tinnie immediately said no. From these different responses to different questions, Deputy Kaiser inferred that Tinnie might have a weapon. It turned out that he was right.

When evaluating Deputy Kaiser's decision to frisk Tinnie, however, we may consider only the information that Deputy Kaiser had at the moment he initiated the frisk and must disregard any information gathered after the frisk had already begun. *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995), citing *Terry*, 392 U.S. at 21-22. My colleagues and the district court both conclude that the frisk had not begun when Deputy Kaiser asked these questions because Deputy Kaiser had not yet laid his hands on Tinnie. In other words, they define a "frisk" narrowly as only those moments during which an officer's hands are in physical contact with a suspect's body.

This narrow definition of a frisk would require us to close our eyes to reality and would encourage aggressive and intrusive police tactics, especially during pretextual traffic stops. Under the majority's definition of a

frisk, officers may tell a suspect that he is going to be frisked and require him to assume the position for a frisk *before* beginning the questioning needed to justify the frisk itself. Bent over the hood of a car or pressed against a wall in the middle of the night, most people would be extremely nervous and disoriented. It would be easy enough for an enterprising police officer to find some justification for a frisk in any nervous responses given at such a vulnerable moment. Moreover, the majority's approach embraces the circular logic that police may justify a frisk by observing how the subject responds when told he is about to be frisked.

For Fourth Amendment purposes, a person can be "seized" before he is actually restrained by physical force, at the moment when, given all the circumstances, a reasonable person would believe he is not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). Essentially the same rule should apply to a frisk. We should determine at what point in time a reasonable person in Tinnie's position would have thought that the officer's actions were part of the process of conducting a frisk. Such a test, like the test applied to seizures, would "assess the coercive effect of police conduct, taken as a whole, rather than . . . focus on particular details of that conduct in isolation." *Chesternut*, 486 U.S. at 573. Furthermore, it would be "flexible enough to be applied to the whole range of police conduct" while "call[ing] for consistent application from one police encounter to the next" and providing uniform guidance to law enforcement officers in the field. *Id.* at 574.

Applying this standard to the facts here, it is clear that Tinnie would reasonably have believed that the frisk was already underway when Deputy Kaiser asked if he had a gun in his possession. By the time Tinnie was asked if he was carrying a gun, Deputy Kaiser had already ordered him out of the car, walked him to the back of the car, and told him that he was about to be frisked. When Deputy Kaiser announced his intent to conduct a frisk, a person in Tinnie's position would reasonably have believed that the frisk procedure had already begun—he certainly would not have felt free to walk away or to refuse to allow Deputy Kaiser to touch him. The frisk had begun by the time Deputy Kaiser asked Tinnie whether he had any weapons or drugs, making Tinnie's responses to those questions irrelevant to the *Terry* analysis.

Based on the facts in the record, I conclude that the frisk of Tinnie violated the Fourth Amendment. But I am not alone in finding a frisk like this to be unjustified. In similar cases, other courts have deemed the searches unconstitutional. For example, in *United States v. McKoy*, 428 F.3d 38 (1st Cir. 2005), police conducted a daylight traffic stop for parking and license plate violations in a high-crime area. As the officers approached, the driver avoided eye contact, appeared nervous, and leaned to reach his right hand toward the center console. Based on those facts, the officers ordered the driver out of the car, frisked him, and found drugs. The First Circuit affirmed the suppression of the evidence found in the frisk, focusing on the need for separate analysis of whether there was reasonable

suspicion that the driver was armed and dangerous. The high-crime area was a relevant factor, but so was the fact that the reason for the stop was only minor traffic violations "from which no assumption about weapons may fairly be drawn." *Id*. at 40. The driver's nervousness and movement did not justify the frisk: "Nervousness is a common and entirely natural reaction to police presence," and the reach for the center console was consistent with reaching for a license or registration. *Id.* The First Circuit acknowledged the vital need for police officers to protect themselves, but it rejected the government's argument, which "comes too close to allowing an automatic frisk of anyone who commits a traffic violation in a high-crime area." *Id*.

The Sixth Circuit affirmed the grant of a motion to suppress in a similar case in *United States v. Wilson*, 506 F.3d 488 (6th Cir. 2007). Officers stopped a driver and passenger who were not wearing seatbelts. Both were nervous, and the driver rambled on in response to one officer's questions and said he had previously been convicted on a federal firearms charge. The car was registered to a different person, and the driver talked on his cell phone and then told the passenger, "They're coming." The officers asked both to get out of the car and then frisked them. The frisk of the passenger turned up drugs. The Sixth Circuit held that the frisk of the passenger was unconstitutional, concluding that the only suspicious conduct that could be ascribed to the passenger himself was his nervousness, which simply was not enough to support the frisk. *Id*. at 495-96.

My colleagues rely on cases that place in sharp relief the lack of any indication that Tinnie was armed and dangerous. For example, my colleagues cite *United States v. Brown*, 273 F.3d 747 (7th Cir. 2001), for the proposition that nervous movements may justify a frisk. But *Brown* permitted a frisk where the defendant had acted nervously before making a threatening "quick move" when asked to step out of his vehicle. 237 F.3d at 748. Tinnie, by contrast, never made a "quick move" (or any other threatening move, for that matter) that Deputy Kaiser could have perceived as threatening.

My colleagues' reliance on *Cady v. Sheahan*, 467 F.3d 1057 (7th Cir. 2006), for the broad proposition that evasive answers indicate dangerousness is equally unpersuasive. Cady was frisked not merely because he was evasive, but because he was also "lurking outside a courthouse well before it opened to the public, was shabbily dressed, had not showered, . . . claimed to be serving federal process on a Sheriff's officer . . . and repeatedly reached into his briefcase." *Id.* at 1062. Evasiveness aside, it is hard to see how Tinnie is comparable to Cady, whose strikingly unusual behavior certainly gave law enforcement reason to believe that he posed a danger to himself or others.

*United States v. Oglesby*, 597 F.3d 891 (7th Cir. 2010), from which the majority claims that Tinnie's mere presence in a high-crime area is significant, is not on point. In *Oglesby*, the defendant was present in a high-crime area, but he also had acted in a manner "potentially calculated to keep a weapon hidden or out of reach"

and appeared to "be trying to confirm that his gun [was] concealed and secured." *Id.* at 895. By contrast, Deputy Kaiser never indicated that he thought Tinnie had tried to conceal a weapon, only that he believed that Tinnie was "hiding something." It has been clear since *Terry*, though, that a belief that a person is acting suspiciously is just not enough to justify a frisk. Under *Terry*, Deputy Kaiser needed more specific reasons for believing that Tinnie posed a danger to himself or others.

We should not overlook Deputy Kaiser's testimony that his standard practice was to frisk anyone whom he asks/orders out of a vehicle during a traffic stop. Of course, an officer's unconstitutional practice cannot invalidate an otherwise-reasonable frisk. But such a standard practice remains simply inconsistent with the rule that frisks are forbidden absent a reasonable and individualized suspicion that a suspect is armed and dangerous, as set forth by *Terry*, *Sibron*, *Ybarra*, 444 U.S. at 92-93 (finding no reasonable suspicion to support frisk where defendant, "whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening"), and a host of lower court decisions. My colleagues speculate that perhaps Deputy Kaiser orders passengers out of the vehicle only when he has constitutionally sufficient suspicion to conduct a frisk. But Deputy Kaiser has the authority to order everyone out of the vehicle, as a matter of course, every time he conducts a traffic stop. *Wilson*, 519 U.S. at 410. So according to his own testimony, Deputy Kaiser either (1) never

exercises this broad, wholly unqualified authority unless he has constitutionally sufficient suspicion to conduct a frisk; or (2) frisks a considerable number of people without the constitutional authority to do so. The first possibility is highly implausible.

Christopher Tinnie is not a sympathetic candidate for the protection of the Fourth Amendment or the benefits of the exclusionary rule. He was guilty of being a felon in possession of a concealed firearm, and an unusually dangerous firearm at that. He has accumulated a lengthy criminal record for, among other things, small-scale drug crimes, battery, and unlawful use of firearms. But the exclusionary rule is not applied for the benefit of Tinnie or other criminals. It is applied to protect *all* citizens from unreasonably intrusive, "proactive," law enforcement practices, even when carried out for laudable goals. Deputy Kaiser did not have a reasonable suspicion that Tinnie was armed and dangerous when he frisked him in the course of the pretextual traffic stop. I therefore respectfully dissent.