FILED
United States Court of Appeals
Tenth Circuit

March 23, 2012

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JOSEPH PAUL HOUSE,

      Defendant-Appellant.

No. 11-4102
(D.C. No. 2:10-CR-00007-DB-1)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **BALDOCK**, and **EBEL**, Circuit Judges.

Defendant-Appellant Joseph Paul House entered a conditional plea of guilty to one count of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), and was sentenced to thirty-nine months' imprisonment and three years' supervised release. On appeal, he argues that the district court erred by denying his motion to suppress because (1) the initial encounter with the arresting officer was not a consensual encounter, and (2) even if it was, the officer's subsequent frisk was not based upon reasonable suspicion. While we cannot agree with the

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

first point, the second is well-taken and we reverse.


Background

At 12:30 in the afternoon on November 20, 2009, Officer Aaron Daley had

just finished investigating a "suspicious activity" call from a woman who heard

noises coming from her basement. The woman claimed that her dog alerted

toward the basement and ran downstairs; the women fled until police arrived.

United States v. House, No. 2:10-CR-007, 2010 WL 4103548 (D. Utah Oct. 18,

2010); Aplee. Br. 2. Upon investigation, there was no evidence of a forced entry

and nothing was missing from the house. House, 2010 WL 4103548, at *1. The

officer did notice a "doggy door" that was large enough for a human to gain

access; however, no one gained entry that way. As the officer was walking to his

car, after spending nearly fifteen minutes in the house, 1 R. 39, he noticed Mr.

House—the only pedestrian in the area—walking eastbound on the sidewalk in

the direction of the woman's house. Id., 2010 WL 4103548, at *1.

Another patrol car approached the intersection where Mr. House was

standing, and Mr. House did an "immediate turnaround," walking in the opposite

direction. Id. The officer got into his car, turned around, and approached Mr.

House at another intersection. The officer thought that Mr. House avoided

making eye contact. Id. The officer then parked his car and approached Mr.

House from the rear. Id. Mr. House was holding a cell phone to his ear with his

- 2 -

right hand and his left hand was in the pocket of his "puffy" coat. Id., 2010 WL 4103548, at \*2. From ten to twelve feet away, the officer asked, "hey, can I talk to you, hey, can I ask you a few questions?" Id. Mr. House continued to walk and talk on his cell phone, so the officer repeated his request and Mr. House ended his call and turned around to face him. Id. The encounter took place on the sidewalk, with just the officer and Mr. House. Id.

Mr. House finally turned around, holding his cell phone in his right hand, and kept his left hand in his coat pocket. Id. The officer noticed what appeared to be a bulge in Mr. House's left coat pocket "that was making it larger than just what an arm or hand would make a coat stick out." 1 R. 49. When questioned, Mr. House replied "no" as to whether he had any weapons on his person, 1 R. 49, but the officer simultaneously noticed the end of a black folding knife protruding from his right coat pocket, 2010 WL 4103548, at \*2. The officer recognized it as a knife similar to the type that he carried on duty. Id. He instructed Mr. House to place his hands behind his back, and the officer removed the knife from Mr. House's pocket. Id. After securing the knife, the officer stated he conducted a "Terry frisk" of Mr. House in "highly probable [areas] for weapons" and felt the butt of a gun near where the bulge was on Mr. House's left side. Id.; 1 R. 30, 31, 51. A backup officer arrived at this point, and the arresting officer retrieved a gun from Mr. House's left waistband. Id., 2010 WL 4103548, at \*3. The serial number on the gun had been obliterated and was filed down. Id. The district

- 3 -

court denied the motion to suppress on the basis that the initial encounter between Mr. House and the officer was consensual, and that the Terry frisk was justified by officer safety concerns. Id., 2010 WL 4103548, at *5-6. The district court reasoned that although no intruder had been found in the woman's home, Mr. House was the only person the officer had seen, Mr. House had apparently changed direction after seeing a marked patrol car, something other than Mr. House's hand may have been in his jacket pocket, and, most significantly, Mr. House had replied that he had no weapons when he had a knife in his pocket. Id.

### Discussion

When reviewing a denial of a motion to suppress, we "view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." United States v. Katoa, 379 F.3d 1203, 1205 (10th Cir. 2004).

A.    Was the Initial Encounter Between House and the Officer Consensual?

We review de novo "the relevant circumstances to determine whether an interaction between an individual and a law enforcement officer is a consensual encounter that does not implicate the Fourth Amendment." United States v. Abdenbi, 361 F.3d 1282, 1291 (10th Cir. 2004). We have developed three categories of police-citizen encounters. United States v. Madrid, 30 F.3d 1269,

- 4 -

1275 (10th Cir. 1994).  The first "involves the voluntary cooperation of a citizen in response to non-coercive questioning."  Id.  The second is a Terry stop, "involving only a brief, non-intrusive detention and frisk for weapons when officers have a reasonable suspicion that the defendant has committed a crime or is about to do so."  Madrid, 30 F.3d at 1275.  The third is an arrest.  Id.  In that case, this court explained:

> [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

Id. at 1276 (alteration in original) (quoting United States v. Little, 18 F.3d 1499, 1503 (10th Cir. 1994)).  The inquiry is objective in nature; the subjective perceptions of the suspect are not determinative.  See id.

Relevant circumstances used to determine whether an interaction between an officer and an individual is consensual include:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

United States v. Rogers, 556 F.3d 1130, 1137-38 (10th Cir. 2009).  The determination is based on the totality of the circumstances.  Id. at 1138.

In Rogers, a police officer patrolling the halls of a hotel known for drug

activity and prostitution saw the defendant, whom he knew from past encounters as "Graveyard," exiting a hotel suite. Id. at 1134. The officer asked the defendant if he could speak to him, and the defendant seemed more nervous than in past encounters. Id. The defendant backed into a suite and informed the officer that the officer should talk to another man who was lying on a bed. At this point, the officer noticed a bag of marijuana in plain view and arrested both men. Id. at 1134-35. We held that the encounter was consensual because, given the totality of the circumstances, the "[o]fficer . . . did not touch Defendant, use aggressive language, brandish a weapon, or retain any of Defendant's personal effects." Id. at 1138.

In this case, only one officer was present for most of the interaction, which took place on a public sidewalk in the middle of the day. The officer remained some distance from Mr. House before the frisk, and the district court found credible the officer's characterization of the interaction as "an everyday encounter." House, 2010 WL 4103548, at *2. The district court also noted that Mr. House testified that he felt like he was "free to leave at [the point that the officer asked him to get off of his cell phone]" but did not do so because staying to answer questions was "the right thing to do." Id., 2010 WL 4103548, at *2. Also, the officer asked Mr. House if he could talk to him or ask him a few questions. Id. Based on the totality of the circumstances, we agree with the district court that the officer's interaction with Mr. House was consensual. The

only factor that weighs against consent is that the interaction took place in the absence of other members of the public, although it was on a public street, but this is not determinative.  See Rogers, 556 F.3d at 1138.

B.      Did Officer Daley Have Reasonable Articulable Suspicion to Frisk?

In Terry, the Supreme Court stated that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot *and* that the persons with whom he is dealing may be armed and *presently dangerous . . .* he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."  392 U.S. 1, 30 (1968) (emphasis added).  The government argues that no reasonable, articulable suspicion of criminal activity is necessary when a search is incident to a consensual stop, and there need be only a reasonable, articulable suspicion that a person is armed and dangerous.  Aplee. Br. 14-22 (citing United States v. Manjarrez, 348 F.3d 881 (10th Cir. 2003))[1].  Though we

---

[1]  Manjarrez does not, in fact, stand for the proposition that reasonable articulable suspicion of criminal activity is unnecessary before conducting a Terry frisk.  The encounter in Manjarrez began as a traffic stop based upon reasonable suspicion, a brief detention took place thereafter, and the defendant was subsequently free to leave.  348 F.3d at 884.  The defendant then consented to additional questions and a search of the vehicle.  Id.  Prior to the search, a brief pat down occurred which yielded nothing.  The court determined that the pat down was lawful based upon the prior consent to search the car, but the legality of the pat down was probably irrelevant because the contraband in the car was discovered based upon the prior consent to search.  In other words, the pat down did not vitiate the prior consent to search the car.

doubt <u>Manjarrez</u> goes this far, we are willing to assume (without deciding) for purposes of this case that an officer may frisk a person pursuant to a consensual encounter when they have only a reasonable articulable suspicion that a person is armed and presently dangerous without any suspicion of criminal activity. At any rate, based upon the totality of the circumstances, Officer Daley lacked the reasonable, articulable suspicion that Mr. House was *presently dangerous* required to justify a protective frisk, rendering the frisk unlawful.

We have considered a variety of unlawful activities supportive of a reasonable, articulable suspicion that a person is armed and dangerous. Drug trafficking comes to mind, <u>see</u> <u>United States v. Garcia</u>, 459 F.3d 1059, 1064-66 (10th Cir. 2006), as does involvement in gang activity or prostitution, <u>id.</u> at 1066-67. While one suspicious factor may not be sufficient, such as presence in a high crime area or unwillingness to speak to an officer, the existence of several factors may tip the scales toward a reasonable suspicion to search. <u>See</u> <u>Maddox</u>, 388 F.3d 1356, 1366-67 (10th Cir. 2004).

In <u>United States v. Harris</u>, 313 F.3d 1228 (10th Cir. 2002), we considered nervous and evasive behavior as a ground for reasonable suspicion that a person is armed and dangerous. In <u>Harris</u>, an officer approached the defendant on the street and asked for identification after a tipster called and claimed that two men in dark clothing were smoking narcotics in a Dairy Queen parking lot. <u>Id.</u> at 1231. The defendant and his companion fit the informant's description, smelled

of marijuana, and refused to comply after the officer repeatedly asked them to show identification, and the defendant appeared nervous with his hands in his pockets. Id. at 1231-32. The officer asked the defendant to remove his hands from his pockets, and when he refused to do so, the officer approached him, removed his hands from his pockets, escorted him to the police car, and frisked him. Id. at 1232. The defendant argued, among other things, that the officer did not have a reasonable articulable suspicion that he was armed and dangerous. Id. at 1236. While the defendant's nervousness alone was not enough to justify the frisk, the court emphasized that the defendant refused to take his hands out of his pockets when asked, giving the officer a reasonable justification for believing that he was armed and dangerous. Id.

This court also found reasonable articulable suspicion that a suspect was armed and dangerous when an officer pulled over a car for a lawful traffic stop at 2:30 am in a high crime area, a backseat passenger gave the officer a false identity, and a background check on one of the passengers revealed that he had a lengthy criminal history of violent crime and was "known to be armed and dangerous." United States v. Rice, 483 F.3d 1079, 1084-85 (10th Cir. 2007). Similarly, in Garcia, this court held that a pat down search was legal pursuant to a lawful search of an apartment for drugs because "an individual's involvement with drug transactions or distribution can support reasonable suspicion to frisk that individual for weapons." 459 F.3d at 1064. Furthermore, at least one of the

apartment's known renters was a known member of a violent street gang.  Id. at 1066-67.

In a recent Fourth Circuit case, however, the court held that a pat down search of a passenger pursuant to a lawful traffic stop at night was unlawful when based only on "caution data" that the passenger had a prior criminal history involving armed robbery and his misrepresentation that his driver's license was valid.  United States v. Powell, 666 F.3d 180, 185-188 (4th Cir. 2011).  The court noted that "[w]ithout more, the caution data certainly does not justify a reasonable suspicion that [the passenger] was armed and dangerous . . . ."  Id. at 188.  Furthermore, the court held that a false statement to an officer, without more, typically will be insufficient to conclude that a suspect is armed and dangerous.  Id. at 188-189.

As the Sixth Circuit noted in United States v. Johnson,"before an officer effectuates a limited frisk for weapons . . . the officer must have a reasonable belief that the suspect is *both* (1) armed, and (2) dangerous."  246 F. App'x 982, 988 (6th Cir. 2007) (unpublished).  We consider each requirement to determine if the frisk of Mr. House was lawful.

Here, a reasonable officer could conclude that Mr. House was armed.  Officer Daley observed a folded knife in Mr. House's pocket and a bulge under his jacket.  1 R. 49.  But there was no indication that he was presently dangerous to Officer Daley or other citizens.  Being armed does not ineluctably equate with

dangerousness. Nothing suggests Mr. House was involved in drug activity, gang activity, or any other crime. In fact, the officer testified at the suppression hearing that Mr. House's turning around at the sight of police and the prior call where no evidence of an intruder was found were all that "raised [his] level of concern." 1 R. 56. When the officer asked if Mr. House had a weapon, and Mr. House said "no," the officer testified that he saw what appeared to be a bulge under Mr. House's jacket pocket and a folded knife sticking out of his jacket pocket. 1 R. 49. The blade of the knife was not exposed. Id. Suspecting that Mr. House was lying, the officer approached him, removed the knife from his pocket, and continued to frisk him in the areas that he believed were "high probable areas for weapons." 1 R. 51. Nothing in the record indicates that the officer ever asked Mr. House to remove his hand from his pocket, like in Harris, 313 F.3d at 1232; 1 R. 29, 48-49, and Mr. House was fully compliant, 1 R. 28 ("He turned around, and it didn't appear to me that he wanted to talk to me, but he was compliant."). "[I]f a policeman sees a suspicious bulge which possibly could be a gun in the pocket of a pedestrian who is not engaged in any suspicious conduct, the officer may not approach him and conduct a frisk. And this is so even though the bulge would support a frisk had there been a prior lawful stop." WAYNE R. LAFAVE, 4 SEARCH AND SEIZURE § 9.6(a) (2004).

In fact, when the officer first saw Mr. House, he was walking *toward* the residence in question some fifteen minutes after the police first arrived there to

- 11 -

investigate.  1 R. 39.  Also, Mr. House did not engage in "headlong flight," like in Illinois v. Wardlow, 528 U.S. 119, 124 (2000), but merely turned around and walked in the opposite direction when he saw police.  Though the officer did spot a knife in Mr. House's pocket after asking him if he had a weapon, the knife was folded and the blade was not exposed.  1 R. 49.  The government argues that Terry allows a frisk when "an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and *presently dangerous to the officer or others . . . .*"  Aplee. Br. 16 (quoting Terry, 392 U.S. at 24) (emphasis added).   A folded knife in a person's pocket hardly poses a danger to an armed officer standing six to eight feet away.  1 R. 29; 2 R. 90.  Similarly, nothing in our caselaw suggests that Mr. House's answer that he did not have a weapon, though he carried a folding knife, warranted an immediate protective frisk.[2]  1 R. 51.

---

[2]  The officer's  testimony suggests that he immediately frisked Mr. House after he saw the knife and Mr. House responded that he did not have any weapons on him:

> Q: "And so at that point, after you had asked him if he had weapons and he said no, you put his hands behind his back once you saw the tip of the knife, right?"
> A: "Yes."
> Q: "And you pulled the knife out of the pocket?"
> A: "Yes, I did."
> Q: "Then you continued to frisk at that point the rest of his body?"
> A: "Just the areas that I believed are the high probable areas for weapons."

1 R. 51.

It is likely that many law-abiding citizens would not consider themselves armed with a weapon, while carrying a folded pocket knife, when approached on the street and questioned unexpectedly by an officer. To allow a search based on the hunch that a citizen walking down the street is illegally carrying a firearm, without more, serves to erode the precious protections of the Second and Fourth Amendments. See Terry, 392 U.S. at 22 ("[I]ntrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches [are] a result this Court has consistently refused to sanction.").

An officer is free to initiate a consensual encounter without any articulable suspicion. Such an encounter may develop previously unconfirmed suspicions of criminal behavior and/or result in genuine concerns for officer safety. United States v. Jones, 606 F.3d 964, 968 (8th Cir. 2010). The difficulty in this case is that the consensual encounter did neither; in the absence of which, the evidence must be suppressed as violative of the Fourth Amendment.

C.    The Dissent

The dissent is simply incorrect when it states that Mr. House was "in the vicinity of a potential home break in." At most, the officer was responding to a suspicious noise call which he then investigated and found no evidence of any crime, let alone a break-in. Mr. House was walking *toward* the residence more than fifteen minutes after the call to police, and then turned away at the sight of law enforcement. Although the dissent posits that a person who is armed and

- 13 -

detained is usually dangerous relying upon Pennsylvania v. Mimms, 434 U.S. 106 (1977), where the defendant was lawfully stopped for expired license plates, here Mr. House was free to leave, having engaged in a purely consensual encounter.

The dissent suggests that we dismiss the danger posed by knives, miss the significance of Mr. House's answer that he had no weapons, require an officer to consider whether a folded knife is a weapon, focus too heavily on the knife, and ignore the threat of the firearm. It contends that this case is controlled by Ryburn v. Huff, 132 S. Ct. 987 (2012), where the Supreme Court reversed a denial of qualified immunity to officers entering a home without a warrant. The Court held that the officers could have an objectively reasonable basis for concluding that an imminent threat of violence existed where officers believed that a student had threatened a school shooting and the student's mother ran into the house, refusing to answer whether there were any guns in the house. Id. at 991-92.

This case differs markedly. We have considered the totality of the circumstances. No one disagrees that a knife can be dangerous, but context matters. Here, the folded knife was observed from several feet away. The officer removed the knife prior to the challenged protective frisk. Given the facts found by the district court, the officer could conclude that Mr. House was armed, despite his denial. But the facts fall far short of any danger, let alone imminent danger. By the officer's own admission, Mr. House was cooperative.

In short, the dissent simply comes too close to equating being armed with

- 14 -

being dangerous regardless of the circumstances. The examples relied upon by the dissent as illustrating circumstances where an armed person might not be considered dangerous—where law enforcement is aware that a citizen is a retired policeman or cooperative with a license to carry a gun—portend too little Fourth Amendment protection for the average citizen and elide the distinction between armed and dangerous.

     REVERSED.

                          Entered for the Court


                          Paul J. Kelly, Jr.
                          Circuit Judge

**BALDOCK,** Circuit Judge, dissenting.

According to the district court, Officer Daley was called to investigate a report that a woman "heard a noise and believed someone may have been in her basement." After concluding a fruitless fifteen-minute investigation of the house, Officer Daley saw Defendant walking toward the house. Daley had seen no one else in the vicinity. Daley then observed Defendant make an abrupt about-face upon seeing a police car drive past. His suspicions aroused, Officer Daley initiated an on-foot consensual encounter with Defendant. When eight to ten feet away from Defendant, Daley observed an exposed folding knife in Defendant's right coat pocket. He also saw Defendant's left hand resting on a large bulge in his left coat pocket. When Officer Daley asked Defendant if he had any weapons, Defendant said "no," despite the visible knife in his pocket. Officer Daley then frisked Defendant and found, in addition to the knife, a .44 caliber revolver in the area of Defendant's left pocket. On these facts, this Court concludes "there was no indication that [Defendant] was presently dangerous to Officer Daley or other citizens," and that the frisk was unconstitutional. Court's Op. at 10. Although the Court recognizes "a reasonable officer could conclude that [Defendant] was armed," id., the Court ignores the totality of the circumstances and the serious threat that a suspected firearm posed to Officer Daley's safety. Instead, the Court cavalierly dismisses Daley's suspicion regarding a firearm as a mere "hunch." Id. at 13. Because the Court's holding disregards settled precedent and exposes officers to unreasonable dangers, I dissent.

I.

This case gives rise to two questions: (1) whether a protective frisk is ever permissible in the absence of reasonable suspicion that criminal activity is afoot, and if so, (2) whether Daley had a constitutionally justifiable basis for conducting a protective frisk in this case. Acknowledging the question is an open one, the Court assumes without deciding that a protective frisk *is* permissible without reasonable suspicion of criminal activity. The Court does not reach this first question because it concludes Officer Daley had no reasonable suspicion Defendant was "dangerous." Because the Court is incorrect on this point, I must address both questions.

Neither the Supreme Court nor the Tenth Circuit has decided whether an officer may lawfully frisk a person absent reasonable suspicion of criminal activity. The Supreme Court first recognized the concept of a stop and frisk, justified on suspicion less than probable cause, in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). The Court in <u>Terry</u> held that an officer could temporarily detain and frisk a person based on reasonable suspicion that "criminal activity may be afoot" and the person "may be armed and presently dangerous." <u>Id.</u> at 30. Although the <u>Terry</u> Court treated a "stop and frisk" as essentially a single transaction, it offered different rationales for the "stop" and the "frisk." The interest of "effective crime prevention and detection," the Court said, justifies officers "approach[ing] a person for purposes of investigating possibly criminal behavior." <u>Id.</u> at 22. A frisk, however, is based on the "immediate interest of the police officer in taking

- 2 -

steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." Id. at 23. So, although the Court said "[w]e merely hold today" that a "stop and frisk" was justified based on reasonable suspicion of criminal activity *and* dangerousness, the Court noted that "[e]ach case of this sort will . . . have to be decided on its own facts." Id. at 30.

Terry simply did not decide whether a frisk can take place absent reasonable suspicion of criminal activity. Justice Harlan made this clear in his concurring opinion, where he said he, unlike the majority, "would make it perfectly clear that the right to frisk in this case *depends upon the reasonableness of a forcible stop to investigate a suspected crime*." Terry, 392 U.S. at 32–33 (Harlan, J., concurring) (emphasis added). But Justice Harlan's view did not win the day. The Terry Court said the limitations on protective frisks "will have to be developed in the concrete factual circumstances of individual cases." [1] Id. at 29. Although the Supreme Court has not addressed this issue, allowing a protective

---

[1]   Our sister circuits are divided on the issue of whether a protective frisk requires suspicion of criminal activity. Three circuits have upheld frisks based solely on officer safety. United States v. Orman, 486 F.3d 1170, 1176–77 (9th Cir. 2007); United States v. Romain, 393 F.3d 63, 75 (1st Cir. 2004); United States v. Bonds, 829 F.2d 1072, 1075 (11th Cir. 1987). Two circuits have concluded that a frisk requires reasonable suspicion of criminal activity. United States v. Burton, 228 F.3d 524, 528 (4th Cir. 2000); United States v. Gray, 213 F.3d 998, 1000 (8th Cir. 2000). Both Burton and Gray relied on Terry, even though Terry did *not* hold that suspicion of criminal activity was always required for a frisk. And the Eighth Circuit has not consistently followed Gray. See United States v. Ellis, 501 F.3d 958, 961–63 (8th Cir. 2007) (upholding a frisk based on safety concerns without identifying any criminal activity for which reasonable suspicion existed).

- 3 -

frisk based solely on officer safety best comports with its precedent.  This is so for three main reasons.

A.

First, the strong governmental interest in officer safety is present even in consensual encounters.  Courts cannot ignore the "need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest."  Terry, 392 U.S. at 24.  This need applies equally to investigative detentions and consensual encounters.  In Pennsylvania v. Mimms, 434 U.S. 106 (1977) (per curiam), the Court held that an officer could order a driver out of his vehicle during a traffic stop.  The Court said, "We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty."  Id. at 110.  The Supreme Court has, admittedly, recognized that the magnitude of the threat to officer safety depends to some extent on the intrusiveness of the encounter.  Knowles v. Iowa, 525 U.S. 113, 117 (1998).  But this hardly stands for the proposition that an officer's safety is *never* at risk during a consensual encounter.  "If a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested."  Michigan v. Long, 463 U.S. 1032, 1050 (1983).

Even though a person is "free to leave" during a consensual encounter, I.N.S. v. Delgado, 466 U.S. 210, 215 (1984), he may still feel threatened by police questioning.  In Maryland v. Wilson, 519 U.S. 408, 414 (1997) the Supreme Court concluded officers may order passengers to exit a validly stopped

- 4 -

car, even though no reason exists to believe the passengers have committed any offense. The Court reasoned that "the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." Id. The Court said, "[T]he motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver." Id. The Court concluded the passengers presented a danger even though they were not suspected of *any* criminal activity. Particularly where, as here, an officer initiates an investigatory encounter based on some suspicious circumstances, the officer could easily feel threatened by an armed person and be justified in conducting a frisk. "The danger to officer safety that justifies a protective search" may arise even during a consensual encounter. United States v. Davis, 202 F.3d 1060, 1063 (8th Cir. 2000).

Other situations could also lead an officer to fear for his safety during a consensual encounter. For example, a person might become belligerent or show signs of mental instability during a consensual encounter, even if the person's actions do not give rise to suspicion of criminal activity. See United States v. Brown, 232 F.3d 589, 593–95 (7th Cir. 2000) (holding a reasonable officer could perceive a threat to his safety from a potentially drunk person acting "erratically"). Not every threatening action is criminalized, and officers need not wait to be assaulted or injured before taking protective action. Terry, 392 U.S. at 23. Rather, Terry's officer safety rationale applies during "*all* legitimate

investigative activities," and justifies a frisk if the officer reasonably fears for his safety during a consensual encounter. United States v. Romain, 393 F.3d 63, 76 (1st Cir. 2004).

In a case decided just this term, the Supreme Court upheld the right of officers to enter a home based on safety concerns, even without probable cause of criminal activity. Ryburn v. Huff, 565 U.S. ---, 132 S. Ct. 987 (2012) (per curiam). In Ryburn, the officers were investigating rumors that a high school student had threatened to "shoot up" the school. Id. at 988. After initially ignoring the officers' knocks, the student's mother came to the front steps. Id. at 988. When asked whether any guns were in the house, the mother "responded by immediately turning around and running into the house." Id. at 989 (internal alterations and quotation marks omitted). The officers followed her into the house based on concerns for their safety. Id. The Supreme Court held the warrantless entry was reasonable because the officers could have feared "an imminent threat to their safety and to the safety of others." Id. at 991. The Court did not discuss whether the officers had probable cause or reasonable suspicion of criminal activity, but held the entry was constitutional because the officers had "an objectively reasonable basis for fearing that violence was imminent."[2] Id. at 992. Ryburn indicates that officer safety renders certain police actions reasonable

---

[2] This "objective reasonable basis" standard is likely the same as Terry's "objective standard" of whether "the facts available to the officer . . . warrant a man of reasonable caution in the belief that the action taken was appropriate." Terry, 392 U.S. at 21–22 (internal quotation marks omitted).

regardless of probable cause or reasonable suspicion that criminal activity is afoot.

B.

Second, requiring reasonable suspicion of criminal activity would hamstring officers' ability to investigate suspicious behavior. If an officer may not conduct a frisk unless he has reasonable suspicion a crime is afoot, then he must protect himself by entirely avoiding those he reasonably believes are dangerous but not necessarily engaged in criminal conduct. See United States v. Burton, 228 F.3d 524, 528 (4th Cir. 2000). But this ignores the real possibility that an officer will only acquire suspicion a person is armed and dangerous *after* he has initiated the consensual encounter. Davis, 202 F.3d at 1063. At this point, the officer no longer has the option to avoid a confrontation. Furthermore, it ignores the fact that police officers have a responsibility to keep the public safe and investigate suspicious activity. The Supreme Court has long recognized that law enforcement officers may "approach[] an individual on the street or in another public place" and "put[] questions to him if the person is willing to listen." Florida v. Royer, 460 U.S. 491, 497 (1983). The Court has also recognized "the strong government interest in solving crimes and bringing offenders to justice." United States v. Hensley, 469 U.S. 221, 229 (1985). But disallowing a protective frisk during consensual encounters would discourage officers from approaching and questioning the *most dangerous* citizens or those they suspect of criminal activity on less than reasonable suspicion. Officers

- 7 -

would be free to initiate consensual encounters with apparently harmless citizens, but be required to avoid citizens who are armed and dangerous. Such a reading of Terry would be unreasonable.

C.

Third, requiring reasonable suspicion of criminal activity before a frisk would prevent officers from taking "reasonable steps to ensure their safety" during consensual encounters. Maryland v. Buie, 494 U.S. 325, 334 (1990). Under this approach, an officer only has two options if he suspects a person he has consensually encountered may be armed and dangerous. First, he may choose to end the encounter and walk away. This is a nonsensical option, because it requires the officer to abandon the legitimate and non-intrusive performance of his duties and exposes him to potential danger in effectuating his retreat. Second, the officer may continue asking questions in hopes of acquiring adequate suspicion of criminal activity to justify a frisk. But this requires the officer to remain in a dangerous situation without taking any steps to ensure his safety. Officers should not be forced to decide between these equally bad options.

Obviously police officers may not frisk simply *any* person on the street who they suspect is armed. Officers must have reasonable suspicion the subject is "armed *and presently dangerous*." Terry, 392 U.S. at 24 (emphasis added). A citizen walking down the street carrying a knife or gun on his person does not necessarily present a danger to police or the public. But some instances certainly

- 8 -

arise in which an officer can reasonably fear a person is dangerous during a consensual encounter. Therefore a valid frisk should not depend on reasonable suspicion that criminal activity is afoot.

II.

Turning to the facts of this case, Officer Daley had reasonable suspicion Defendant was both armed and dangerous. A reasonable suspicion inquiry must be based on the "totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." United States v. Rice, 483 F.3d 1079, 1083 (10th Cir. 2007). Defendant was the only person in the vicinity of a potential home break-in. Daley observed Defendant do a 180-degree turn when he caught sight of a police car. These facts were suspicious enough to warrant further investigation. "Officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious *to warrant further investigation.*" Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (emphasis added). Here, Defendant's presence near the scene of a police investigation was at least enough to raise some suspicion, however slight, particularly because Defendant was the only person seen in the vicinity. Additionally, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Id. Defendant's 180-degree turn upon seeing a police car was an indication of nervousness that legitimately increased Officer Daley's suspicion. These two facts, standing alone,

were not enough for reasonable suspicion of criminal activity, but were at least enough to prompt further investigation. Officers are entitled to approach people and ask questions based on a hunch, or even with no suspicion at all. See United States v. Drayton, 536 U.S. 194, 200 (2002).

Once Officer Daley initiated the consensual encounter, he quickly developed reasonable suspicion Defendant was armed. In fact, Officer Daley *knew* Defendant was armed with a knife because he saw the knife's tip in Defendant's right coat pocket. Furthermore, Officer Daley had reasonable suspicion Defendant was armed with a gun. Unlike in Terry, this suspicion was not based on the abstract proposition that a person involved in a particular crime may have a gun. Terry, 392 U.S. at 28 (concluding it was reasonable to suspect men contemplating a daytime robbery would be armed). Instead, Daley's suspicion was based on his direct observation that Defendant had "his left hand in his pocket" and "it appeared that there was something that was making it larger than just what an arm or hand would make a coat stick out." In Mimms, the Supreme Court upheld a frisk where the officer noticed a "large bulge under [the defendant's] sports jacket." 434 U.S. at 107. The only "criminal activity" at issue in Mimms was driving with an expired license plate, a crime unassociated with weapons. Id. Yet the Court said, "The bulge in the jacket permitted the officer to conclude that Mimms was armed . . . ." Id. at 112. So the bulge in Defendant's left pocket was sufficient to give Officer Daley reasonable suspicion that Defendant was armed with a gun, in addition to the visible knife.

A.

Although the Court recognizes Daley had reasonable suspicion Defendant was armed, the Court nevertheless concludes "there was no indication that [Defendant] was presently dangerous to Officer Daley or other citizens."  Court's op. at 10.  The Court is correct that "[b]eing armed does not ineluctably equate with dangerousness."  Id. at 10–11.  For example, a retired policeman or a cooperative citizen licensed to carry a gun may not present a danger to police, depending on the circumstances.  But the Supreme Court had indicated that an armed person is *usually* dangerous, at least if he is detained by the police.  In Mimms, the state conceded "the officer had no reason to suspect foul play from the particular driver at the time of the stop, there having been nothing unusual or suspicious about his behavior."  434 U.S. at 109.  Yet the Court said the bulge "permitted the officer to conclude that Mimms was *armed and thus posed a serious and present danger to the safety of the officer*."  Id. at 112 (emphasis added).  The Mimms Court apparently treated being armed as equivalent with being dangerous, even when there was *no* suspicious activity other than an expired license plate.[3]  Yet here, the Court simply ignores the danger posed by

_____

[3]     This is not to say Mimms renders the "dangerous" inquiry superfluous, however.  Mimms can likely be explained based on the confrontational circumstances inherent in a traffic stop.  When an officer conducts a traffic stop, he has restricted a person's liberty and potentially made that person feel threatened or angry enough to harm the officer.  Wilson, 519 U.S. at 414.  In such a situation, any armed person is potentially dangerous.  In a consensual encounter such as the one involved here, the officer has not restricted the person's liberty and the person is free to walk away.  Florida v. Royer, 460 U.S. 491, 497–98 (1983).  But an officer can nevertheless reasonably fear danger from an armed

- 11 -

Defendant's potential possession of a firearm.

Furthermore, this case is even stronger than <u>Mimms</u> because it involves additional suspicious circumstances not present in <u>Mimms</u>.[4] Defendant was in the vicinity of a criminal investigation and appeared desirous of avoiding law enforcement. He was visibly armed with a knife, yet said "no" when asked if he had any "weapons." In <u>Ryburn</u>, the Court said the officer's entry of the house "to avoid injury to themselves or others was imminently reasonable" based on the woman's response of "turning and running into the house after refusing to answer a question about guns." <u>Ryburn</u>, 132 S. Ct. at 992. Similarly, Officer Daley was faced with a person who was clearly lying about his possession of a weapon. Based on the totality of the circumstances, Officer Daley could reasonably conclude that Defendant was trying to conceal his possession the knife or additional weapons. This suspicion justified a protective frisk.

B.

In concluding Defendant was not "dangerous," the Court errs in three important ways. First, the Court unreasonably dismisses the dangers posed by knives. The Court says, "A folded knife in a person's pocket hardly poses a danger to an armed officer six to eight feet away." This cannot be the law. Six to

person during a consensual encounter. <u>See</u> <u>Orman</u>, 486 F.3d at 1176.

[4] These circumstances distinguish the present case from Professor LaFave's hypothetical, quoted by the Court, of a bulge in "the pocket of a pedestrian *who is not engaged in any suspicious conduct*." 4 Wayne R. LaFave, Search and Seizure § 9.6(a) (2004) (emphasis added). Here, Officer Daley had observed suspicious conduct, even if the conduct did not give rise to reasonable suspicion.

eight feet is a distance that can be covered in two or three steps. This is hardly enough distance to render a knife unthreatening. <u>See</u> <u>Estate of Larsen ex rel. Sturdivan v. Murr</u>, 511 F.3d 1255, 1261 n.1 (10th Cir. 2008) (noting that Denver, Colorado's police training manual "instructs that knife-wielding persons within 21 feet pose an 'imminent threat' to officers based on the time in which the distance can be closed in an attack").

Nor does it matter that the knife was folded. Even a folding knife can be opened quickly and used as a weapon. The Seventh Circuit upheld the patdown of a vehicle passenger who had a "folded pocket knife visible in his front left pocket." <u>United States v. Robinson</u>, 615 F.3d 804, 805 (7th Cir. 2010). The Court said the officers were "authorized by <u>Terry</u> to make sure that he had nothing else in his possession that would endanger their safety." <u>Id.</u> at 807. Likewise, the Eighth Circuit upheld a patdown where an officer observed a "small, folded knife" on the dashboard of a stopped car. <u>United States v. Sanders</u>, 196 F.3d 910, 912 (8th Cir. 1999). So the Court is wrong to conclude that a folded knife "hardly poses a danger" to an officer only a few steps away.

Next, the Court's reasoning is flawed because it misses the knife's greater significance. Regardless of whether the knife posed a danger, its presence refuted Defendant's statement that he had no weapons. A reasonable officer could conclude that a person trying to conceal his possession of a knife may also be concealing other weapons. He could also conclude the person was dangerous based on his desire to conceal a weapon from police detection. <u>See</u> <u>United States</u>

- 13 -

v. Simpson, 609 F.3d 1140, 1149 (10th Cir. 2010) ("[L]ies, evasions or inconsistencies about any subject . . . may contribute to reasonable suspicion."). The Court says "many law-abiding citizens would not consider themselves armed with a weapon, while carrying a folded pocket knife." Court's op. at 13. Whether this is true or not, it is irrelevant for several reasons.

First, we measure the reasonableness of police conduct based on a reasonable officer's viewpoint, not a citizen's. A court must ask whether "the facts available *to the officer* at the moment of . . . the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." Terry, 392 U.S. at 21–22 (emphasis added). See also United States v. Sanchez, 519 F.3d 1208 (10th Cir. 2008) ("An officer may conduct a pat-down search if *he or she* harbors an articulable and reasonable suspicion that the person is armed and dangerous." (internal quotation marks omitted) (emphasis added)). Whether a law-abiding citizen would consider a knife a "weapon" is entirely different from whether a police officer could reasonably fear a knife might be used as a weapon.

Second, courts have consistently treated knives as "weapons." In Terry, the Court noted that virtually all officer deaths and a substantial portion of officer injuries are inflicted with "guns and knives." Id. at 24. The Court said a frisk is justified "to discover guns, *knives*, clubs, or other hidden instruments for the assault of the police officer." Id. at 29 (emphasis added). Consistent with Terry, we have concluded a "frisk was justified" when a stopped driver informed the officer he had a knife in his belt. United States v. Mikulski, 317 F.3d 1228, 1234

(10th Cir. 2003). As the Ninth Circuit has observed, "The possibility of a surprise attack at close quarters with even a small knife presents danger sufficient to justify an officer in taking reasonable protective measures . . . ." United States v. Mattarolo, 209 F.3d 1153, 1158 (9th Cir. 2000). To conclude that folded knives are not "weapons" would be a serious departure from precedent and simply unreasonable.

Third, we do not require a police officer to consider the fine distinctions of whether a folded knife is a "weapon" while making split-second determinations regarding his safety. "The reasonableness of a police officer's actions is evaluated from the perspective of a reasonable officer on the scene, recognizing the police officer may have been forced to make split-second decisions in a stressful, dynamic, and dangerous environment." Lundstrom v. Romero, 616 F.3d 1108, 1120 (10th Cir. 2010). The Supreme Court recently reminded us that "judges should be cautious about second-guessing a police officer's assessment, made on the scene of the danger presented by a particular situation." Ryburn, 132 S. Ct. at 991–92. We are not to judge the dangers of a situation "[w]ith the benefit of hindsight and calm deliberation," but from the "perspective of a reasonable officer on the scene." Id. (quoting Graham v. Connor, 490 U.S. 386, 396–97 (1989)). Officer Daley saw a folding knife, an instrument that undoubtedly can be used as a weapon. He also observed a bulge consistent with a handgun. Yet Defendant denied having any weapons. Officer Daley could reasonably suspect Defendant was lying in an effort to conceal his possession of a

weapon or weapons.

A final and most critical flaw in the Court's analysis is that it focuses almost exclusively on the knife, while ignoring the threat of a firearm. Even if the Court were correct that a folded knife poses little danger at six to eight feet, a firearm certainly does pose a danger. This is especially true because Defendant's hand was *on* the apparent bulge in his pocket. Defendant could have drawn and fired the gun at any time, or even fired it through his pocket. The Court points out that Daley never asked Defendant to remove his hand from his pocket. But the Fourth Amendment does not require such a preliminary step because "officers do not always have to use the least restrictive means as long as their conduct is reasonable." Thomas v. Durastanti, 607 F.3d 655, 665 (10th Cir. 2010). An officer should not "have to ask one question and take the risk that the answer might be a bullet." Terry, 392 U.S. at 33 (Harlan, J., concurring). Whatever the Court thinks of the dangers of folding knives, it cannot deny that firearms pose a serious threat of harm. And the facts here clearly show Officer Daley had reasonable suspicion Defendant possessed a firearm. Yet the Court tries to hedge even this point. The Court says allowing a search "based on the *hunch* that a citizen walking down the street is illegally carrying a firearm, without more, serves to erode the precious protections of the Second and Fourth Amendments." (emphasis added). A hunch, as Terry makes clear, is very different from reasonable suspicion. Terry, 392 U.S. at 22. But the Court's suggestion that the bulge in Defendant's coat supported only a "hunch" flies in the face of Mimms.

434 U.S. at 112 ("The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer."). The facts clearly show Officer Daley had more than a "hunch" Defendant possessed a gun.

We should not second-guess Officer Daley's determination that the subject of a consensual encounter who was obviously armed with a knife, possibly armed with a handgun, and patently lying about his possession of a weapon was dangerous. We have been cautioned not to "require that police officers take unnecessary risks in the performance of their duties." Terry, 392 U.S. at 23. But the Court's holding today does exactly that. I therefore dissent.